# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

**VALERO MARKETING AND SUPPLY CO.**      **CIVIL ACTION**

**VERSUS**      **NO. 14-2712**

**M/V ALMI SUN, IMO NO. 9579535, her engines,**      **SECTION: "G"(4)**
**apparel, furniture, equipment, appurtenances, tackle,**
**etc.,** *in rem*,

## ORDER

Before the Court is Plaintiff Valero Marketing and Supply Co.'s ("Valero") "Motion for Summary Judgment," wherein it contends that it is entitled to summary judgment in its favor finding that its maritime lien claim is valid and enforceable against the M/V ALMI SUN, IMO No. 9579535 ("Vessel").[1] Having considered the motion, the memoranda in support and in opposition, the record, and the applicable law, the Court will deny the motion.

## I. Background

### A. *Factual Background*

This lawsuit arises out of a contract dispute wherein Valero, a marine fuel supplier, alleges that it supplied approximately 200 metric tons of marine bunker fuel to the Vessel on or about October 25, 2014 at Corpus Christi, Texas, for which it was never paid.[2] Valero contends that it entered into a maritime contract for the supply of fuel bunkers to the Vessel ("Bunker Contract") with O.W. Bunker USA, Inc. ("O.W. USA"), which Valero alleges acted as an agent for the vessel.[3]

---

[1] Rec. Doc. 14.

[2] Rec. Doc. 1 at p. 2.

[3] *Id.*

1

The Bunker Contract required payment for the bunkers within 30 calendar days of delivery and provided for the accrual of interest on any late payments.[4] The Bunker Contract also contained a provision stating:

> IT IS UNDERSTOOD THAT IN CONSIDERATION OF EXTENDING THE ABOVE CREDIT TERMS, VALERO IS ALSO RELYING ON THE CREDIT OF THE ABOVE VESSEL AS UNDER U.S. LAW, AND VALERO EXPRESSLY RETAINS ITS RIGHT OF MARITIME LIEN AGAINST THE VESSEL. ANY ATTEMPT TO IMPAIR OR LIMIT SAID LIEN AGAINST THE VESSEL SHALL NOT BE ALLOWED.[5]

In a practice common to the marine bunker fuel industry, O.W. Bunker Malta Ltd. ("O.W. Malta") acted as a "middle man," wherein vessel owners or charterers would issue a request to O.W. Malta, who would send it to O.W. USA, who then selected a local fuel supplier—in this case, Valero.[6] Valero alleges that it held up its end of the bargain and delivered 199.98 of metric tons of fuel to the Vessel, and that although the "authorized vessel officer" of the Vessel acknowledged receipt of the fuel and stamped Valero's bunkering certificate,[7] Valero has never received the $124,388.24 that it is owed for its services.[8]

According to Valero, after it supplied bunkers to the Vessel, the O.W. Bunker group of companies, including O.W. Malta and O.W. USA, underwent a complete collapse of their worldwide business operation.[9] Valero contends that O.W. USA advised Valero that it would not make any of

---

[4] *Id.* at pp. 2–3.

[5] Rec. Doc. 14-3 at p. 2.

[6] Rec. Doc. 14-1 at p. 2; Rec. Doc. 18-1 at p. 1.

[7] Rec. Doc. 14-1 at p. 3.

[8] Rec. Doc. 1 at p. 3.

[9] Rec. Doc. 14-1 at p. 5.

the required payments under their sales agreement, and that on November 13, 2014, O.W. USA and other related entities filed for Chapter 11 bankruptcy.[10] O.W. Malta, from which the bunkers had been ordered in the first place, also declared bankruptcy at about the same time.[11] The owners of the Vessel then commenced arbitration proceedings in London against O.W. Malta and its alleged assignee bank, ING Bank, seeking a declaration of non-liability toward O.W. Malta/ING Bank with respect to their alleged claim for payment.[12] Those proceedings remained ongoing as of June 19, 2015.[13]

**B.    *Procedural Background***

On November 26, 2014, Valero filed the instant suit and requested this Court to arrest the Vessel, which the Court granted on the same day.[14] Valero and the Vessel's owner then entered into a security agreement whereby a letter of undertaking ("LOU") was posted as the substitute *res* for Valero's claim against the vessel.[15] On April 10, 2015, Verna Marine Co. Ltd. ("Verna"), appearing solely and restrictively as *in rem* claimant and owner of the M/V ALMI SUN, filed an answer.[16] Valero filed the pending motion for summary judgment on June 5, 2015.[17] Verna filed an opposition

---

[10] *Id.*

[11] Rec. Doc. 18-1 at p. 2.

[12] *Id.*

[13] *Id.*

[14] Rec. Doc. 4.

[15] Rec. Doc. 14-1 at p. 5.

[16] Rec. Doc. 10.

[17] Rec. Doc. 14.

on June 19, 2015,[18] to which Valero filed a memorandum in reply on June 26, 2015.[19]

## II. Parties' Arguments

### A. *Valero's Arguments in Support of Summary Judgment*

Valero argues that there is no genuine disputed issue of material fact, and that the solitary issue before the Court is whether Valero possesses a valid maritime lien upon the Vessel that can be enforced directly against the Vessel *in rem* (or the LOU) to satisfy the overdue payment for the fuel bunkers in question.[20] Valero avers that the matter is controlled by the Commercial Instruments and Maritime Liens Act ("CIMLA"), which provides in relevant part:

> (a) Except as provided in subsection (b) of this section, a person providing necessaries to a vessel on the order of the owner or a person authorized by the owner—
> > (1) has a maritime lien on the vessel;
> > (2) may bring a civil action in rem to enforce the lien; and
> > (3) is not required to allege or prove in the action that credit was given to the vessel.
> (b) This section does not apply to a public vessel.[21]

According to Valero, CIMLA defines "necessaries" as including "repairs, supplies, towage, and the use of a dry dock or marine railway,"[22] and also provides that:

> (a) The following persons are presumed to have authority to procure necessaries for a vessel:
> > (1) the owner;
> > (2) the master;
> > (3) a person entrusted with the management of the vessel at the port of supply; or

---

[18] Rec. Doc. 18-1.

[19] Rec. Doc. 21.

[20] Rec. Doc. 14-1 at p. 6.

[21] *Id.* (citing 46 U.S.C. § 31342).

[22] *Id.* (citing 46 U.S.C. § 31301(4)).

4

> (4) an officer or agent appointed by—
>> (A) the owner;
>> (B) a charterer;
>> (C) an owner pro hac vice;
>> (D) an agreed buyer in possession of the vessel.[23]

Valero contends that the maritime lien conferred by CIMLA is statutory in nature and does not require a contract between the parties.[24] Where CIMLA's requirements are satisfied, according to Valero, the necessaries supplier possesses a maritime lien against the vessel to which it supplied the necessaries, and a statutory right of recovery against the vessel irrespective of the contractual relationship between them.[25] Thus, Valero avers, if the statutory requirements of 46 U.S.C. § 31342 are satisfied, Valero possesses a maritime lien under CIMLA.[26] Here, Valero argues, each of the requirements of CIMLA has been satisfied, and therefore summary judgment is warranted in Valero's favor.[27]

First, Valero argues, there is no legitimate dispute that bunkers are "necessaries" under CIMLA, as they are useful to the Vessel to which they are supplied, and enable it to perform its particular function.[28] Similarly, Valero avers, there is no dispute that the bunkers supplied by Valero were pumped directly into the bunker tanks of the Vessel and so were supplied "to a vessel," as confirmed by the "Bunkering Certificate" issued by Valero and signed and stamped by the

---

[23] *Id.* at pp. 6–7 (citing 46 U.S.C. § 31341(a)).

[24] *Id.* at p. 7.

[25] *Id.*

[26] *Id.*

[27] *Id.* at p. 8.

[28] *Id.*

Authorized Vessel Officer of the Vessel.[29] Finally, Valero argues that the Vessel's owner and/or charterer are undisputedly parties under CIMLA § 31341(a) that possess the authority to procure necessaries for a vessel, and that Valero ultimately delivered the bunkers to the Vessel upon their order.[30] Valero contends that this is true even in the absence of a direct contract between Valero and the Vessel interests.[31] Therefore, according to Valero, "it is not necessary for Valero to establish an agency relationship or privity between the Vessel interests and O.W. USA or OW Malta, the 'middleman' parties . . . ."[32]

According to Valero, the Fifth Circuit has noted that there are two lines of cases dealing with the situation where no contract exists between the supplier and vessel interests: (1) the general contractor/subcontractor line of cases, and (2) the middle-man line of cases.[33] Valero quotes the Fifth Circuit's decision in *Lake Charles Stevedores, Inc. v. PROFESSOR VLADIMIR POPOV MV* for the proposition that "[u]nder the middle-man line of cases, despite what can be a large number of intermediaries, the ultimate supplier of the necessaries may obtain a maritime lien under certain circumstances," circumstances which Valero contends are met here.[34]

Valero relies on a Ninth Circuit case that it contends is directly on point and clearly establishes that Valero possesses a maritime lien that may be enforced here.[35] In *Marine Fuel Supply*

---

[29] *Id.*

[30] *Id.*

[31] *Id.* at p. 9.

[32] *Id.*

[33] *Id.* (citing *Lake Charles Stevedores, Inc. v. PROFESSOR VLADIMIR POPOV MV*, 199 F.3d 220, 228–29 (5th Cir. 1999)).

[34] *Id.* (citing *Lake Charles Stevedores*, 199 F.3d at 229).

[35] *Id.*

*& Towing, Inc. v. M/V Ken Lucky*, Valero contends, the vessel's sub-charterer Bulkferts, through its managing agent Eurostem, ordered bunkers for the vessel through a broker, Brook.[36] According to Valero, Brook placed the order through Gray Bunkering, which in turn placed the order with supplier Marine Fuel, who delivered the bunkers and invoiced Brook via Gray Bunkering.[37] Valero avers that  Brook subsequently went into receivership and failed to pay for the bunkers, so Marine Fuel arrested the vessel and asserted a maritime lien for the provision of necessaries.[38] According to Valero, the vessel owner contested the lien on the ground that Brook was not the agent of Bulkferts and thus was not authorized to procure necessaries for the Vessel.[39] Valero asserts that the Ninth Circuit rejected this argument, stating that an agency relationship between Brook and Bulkferts was not required in order to entitle Marine Fuel to a maritime lien under CIMLA.[40]

Valero contends that the *Ken Lucky* court distinguished its holding that Marine Fuel possessed an enforceable maritime lien from an earlier ruling by the court in *Farwest Steel Corp. v. Barge Sea-Span*, where the court held that a general repair contractor was not endowed with sufficient "management" authority to support a necessaries lien.[41] According to Valero, the *Ken Lucky* court explained that *Farwest* involved an order of steel by a contractor repairing the vessel, and thus no one with authority to lien the vessel originated the order; by contrast, Bulkferts clearly

---

[36] *Id.* (citing *Marine Fuel Supply & Towing, Inc. v. M/V Ken Lucky,* 869 F.2d 473, 476 (9th Cir. 1988)).

[37] *Id.* (citing *Ken Lucky*, 869 F.2d at 477).

[38] *Id.* (citing *Ken Lucky*, 869 F.2d at 477).

[39] *Id.* (citing *Ken Lucky*, 869 F.2d at 477).

[40] *Id.* at p. 10 (citing *Ken Lucky*, 869 F.2d at 477).

[41] *Id.* (citing *Farwest Steel Corp. v. Barge Sea-Span*, 828 F.2d 522 (9th Cir. 1987), *cert. denied*, 485 U.S. 1034 (1988)).

possessed statutory authority to bind the vessel.[42]

Valero alleges that a Fifth Circuit case, *L&L Oil Co. v. M/V Rebel*, also supports the conclusion that Valero possesses a valid maritime lien claim.[43] There, Valero alleges, Enjet, which was a voyage charterer of a vessel and in the business of supplying fuel, had an agreement with the vessel interests by which they agreed to buy fuel from Enjet for a voyage.[44] According to Valero, Enjet arranged fuel delivery through L&L, which supplied the fuel and invoiced Enjet and the vessel.[45] Valero contends that the vessel interests paid Enjet, but Enjet went into bankruptcy without paying L&L, and L&L thereupon asserted a maritime lien directly against the vessel.[46] According to Valero, the Fifth Circuit affirmed the lower court's finding that L&L possessed a maritime lien, reasoning that Enjet had actual authority to purchase necessaries and bind the vessel under CIMLA.[47] Valero argues that the fact that the Authorized Vessel Officer of the Vessel accepted and signed for the delivery further confirms the validity of Valero's lien claim.[48] Valero alleges that the law is well-established that, within the meaning of CIMLA § 31341(a)(4), an officer of a vessel is a person "entrusted with the management of the vessel."[49] Valero contends that in *Atlantic & Gulf*

---

[42] *Id.* (citing *Ken Lucky*, 869 F.2d at 477).

[43] *Id.* (citing *L&L Oil Co. v. M/V Rebel*, 96 F.3d 1445 (5th Cir. 1996)).

[44] *Id.* (citing *L&L Oil*, 96 F.3d at 1445).

[45] *Id.* (citing *L&L Oil*, 96 F.3d at 1445).

[46] *Id.* at pp. 10–11 (citing *L&L Oil*, 96 F.3d at 1445).

[47] *Id.* at p. 11 (citing *L&L Oil*, 96 F.3d at 1445).

[48] *Id.*

[49] *Id.* (citing *The Eastern*, 275 Fed. 874 (D. Mass. 1919); *Marine Fuel Supply & Towing, Inc. v. M/V Ken Lucky*, 869 F.2d 473, 476 (9th Cir. 1988); *Atl. & Gulf Stevedore, Inc. v. M/V Grand Loyalty*, 608 F.2d 197, 200 (5th Cir. 1979)).

*Stevedore, Inc. v. M/V Grand Loyalty*, the Fifth Circuit expressly rejected the contention that prior authorization is required in order to find that a vessel's officer may authorize the provision of necessaries.[50] Thus, Valero argues, no dispute exists that an order to refuel the Vessel emanated from the Vessel's owner or charterer, two entities who are clearly authorized to bind the Vessel and thereby create a maritime lien under CIMLA.[51] Furthermore, Valero contends, the provision of bunkers to the Vessel was subsequently ratified by the Vessel's authorized officer, a person "entrusted with the management of the vessel" and with the full statutory authority to procure necessaries.[52]

Thus, Valero alleges, it is entitled to enforce its liens against the LOU, and requests that the Court grant its motion for summary judgment, find that Valero possesses a maritime lien against the Vessel, and order that the lien plus interest, costs and reasonable attorneys' fees, as expressly authorized in Valero's terms and conditions associated with the underlying transactions, may be satisfied against the LOU in its entirety.[53]

**B.     *Verna's Arguments in Opposition to Summary Judgment***

In opposition, Verna, the owner of the Vessel, asserts that this maritime *in rem* action arises out of an international commercial crisis created by the worldwide bankruptcy filings of the O.W. Bunker Group of companies, which has spawned hundreds of lawsuits around the world similar to this one, "where the actual supplier of fuel is unpaid by an OW Bunker entity and an innocent

---

[50] *Id.* at pp. 11–12 (citing *Grand Loyalty*, 608 F.2d at 202).

[51] *Id.* at p. 12.

[52] *Id.*

[53] *Id.* at pp. 13–14.

shipowner is facing demands for double payment."[54] Verna alleges that O.W. Malta and its assignee, ING Bank, are demanding payment from Almi Tankers S.A. ("Almi"), which acted as agent of the owners of the Vessel and contracted with O.W. Malta to provide fuel to the Vessel, "even though OW Malta and ING Bank have no intention of paying Valero."[55] Thus, Verna contends, the Vessel now "faces dual and mutually exclusive claims for the same bunker supply—one from the party with which the Vessel owner contracted and one from the party which actually rendered the service."[56]

Verna argues that, because this is an *in rem* action only, Plaintiff's recovery is predicated on there being a maritime lien on the Vessel as a matter of law.[57] Here, Verna alleges, Valero does not have such a lien, because controlling precedent from the Fifth Circuit establishes that sub-contractors providing services to a vessel do not have a maritime lien unless specifically selected by the Vessel's owner or charterer.[58] Moreover, Verna avers, the contractual terms between O.W. USA and Valero do not bind the Vessel where neither the Vessel's owner nor charterer were parties to the contract.[59]

Verna does not dispute that the fuel delivered by Valero constituted "necessaries" under CIMLA, but alleges that the Fifth Circuit and other courts have made clear that the provision of "necessaries" gives rise to a lien "*only* when ordered by the owner or charterer or some other party

---

[54] Rec. Doc. 18-1 at p. 1.

[55] *Id.* at p. 2.

[56] *Id.* at p. 3.

[57] *Id.*

[58] *Id.*

[59] *Id.*

authorized to bind the vessel."[60] In this case, Verna contends, the order pursuant to which Valero supplied fuel to the Vessel did not come from the owner or charterer or some other authorized person, and therefore there is no maritime lien.[61]

Verna relies on *Lake Charles Stevedores, Inc. v. PROFESSOR VLADIMIR POPOV MV*, a Fifth Circuit case in which Verna alleges a stevedore[62] brought an *in rem* action against a vessel for stevedoring services for which it had not been paid.[63] According to Verna, in *Lake Charles Stevedores*, the vessel's sub-charterer had entered into a voyage charter which required it to deliver a cargo of rice.[64] Verna contends that the sub-charterer contracted with a rice company to provide the rice and to load it onto the vessel in Louisiana, and that the rice company hired the plaintiff stevedoring company to load the rice but failed to pay for the stevedore's services before going into receivership.[65] According to Verna, the stevedore then arrested the vessel to secure payment, claiming that it had a maritime lien.[66] Verna argues that, although stevedoring services, like the provision of bunkers in this case, are a "necessary" which in some cases can give rise to a maritime lien, the Fifth Circuit nevertheless held that the stevedore did not hold a lien because it was merely

---

[60] *Id.* (citing *Lake Charles Stevedores, Inc. v. PROFESSOR VLADIMIR POPOV MV*, 199 F.3d 220, 224 (5th Cir. 1999); *Galehead, Inc. v. M/V Anglia*, 183 F.3d 1242, 1244–45 (11th Cir. 1999)).

[61] *Id.* at p. 4.

[62] A stevedore is a "person or company that hires longshore and harbor workers to load and unload ships." *Black's Law Dictionary* (9th ed. 2009).

[63] Rec. Doc. 18-1 at p. 4 (citing 199 F.3d 220, 222–23 (5th Cir. 1999)).

[64] *Id.* (citing *Lake Charles Stevedores*, 199 F.3d at 222–23).

[65] *Id.* (citing *Lake Charles Stevedores*, 199 F.3d at 222–23).

[66] *Id.* (citing *Lake Charles Stevedores*, 199 F.3d at 222–23).

a subcontractor of the party charged with loading the cargo.[67] Verna contends that the Fifth Circuit, like other courts, held that an intermediary or subcontractor does not have a maritime lien unless the vessel's owner or charterer directs the hiring of a specific subcontractor.[68]

According to Verna, the Fifth Circuit relied upon the Eleventh Circuit decision in *Galehead, Inc. v. M/V ANGLIA* to hold that the vessel owner's mere knowledge of the subcontractor's identity before services were rendered is insufficient to show that the vessel owner directed the hiring of a particular subcontractor, entitling it to a maritime lien.[69] Verna avers that the Fifth Circuit also recognized that the vessel's mere acceptance of services from the subcontractor did not constitute the vessel's tacit approval of the subcontractor and did not entitle the subcontractor to a maritime lien.[70] As such, Verna alleges, the vessel's acceptance of the rice that was delivered to it represented acceptance of delivery from the party that the vessel owner contracted with, not from the subcontracted stevedore.[71]

Verna argues that, in the present case, Almi acted as the agent of the owners of the Vessel to contract with O.W. Malta to supply fuel, who in turn transferred this obligation to O.W. USA.[72] Verna alleges that, like the stevedore in *Lake Charles Stevedores*, Valero was then hired by O.W.

---

[67] *Id.* (citing *Lake Charles Stevedores*, 199 F.3d at 222–23).

[68] *Id.* (citing *Port of Portland v. M/V Paralla*, 892 F.2d 825, 828 (9th Cir. 1989); *Farwest Steel Corp. v. Barge Sea-Span*, 818 F.2d 522, 526 (9th Cir. 1987); *Integral Control Sys. Corp. v. Consol. Edison Co.*, 990 F. Supp. 295, 301 (S.D.N.Y. 1998)).

[69] *Id.* (citing *Galehead, Inc. v. M/V ANGLIA*, 183 F.3d 1242, 1246 (11th Cir. 1999)).

[70] *Id.* at p. 5 (citing *Lake Charles Stevedores*, 199 F.3d at 232).

[71] *Id.* (citing *Lake Charles Stevedores*, 199 F.3d at 232).

[72] *Id.*

USA as a subcontractor.[73] Verna contends that Valero's contract with O.W. USA accordingly identifies O.W. USA as the "Buyer" and makes no mention of the Vessel's owner or charterer.[74] Verna argues that Valero has not alleged any dealings it had with the Vessel's owner or charterer or with any other party authorized to bind the Vessel aside from receiving a signed receipt from the Vessel's crew for the fuel Valero delivered, which, Verna asserts, is not sufficient to create a maritime lien.[75]

Verna also contests Valero's reliance on *Marine Fuel Supply & Towing, Inc. v. M/V Ken Lucky*, a Ninth Circuit case that Verna contends the Fifth Circuit has explained does not apply to the circumstances of this case.[76] In *Ken Lucky*, Verna avers, a vessel subcharterer's managing agent ordered fuel from an approved firm which, in turn, requested the services of a fuel supplier, who was notified that "it had been nominated by the vessel's owner to supply the vessel."[77] Verna argues that, here, Valero was not nominated by the Vessel owner, so *Ken Lucky* is inapplicable.[78] Moreover, Verna argues, the Fifth Circuit has explained that determining which party holds a maritime lien depends on the nature of the relationship between the parties and the contractual risks they bear.[79] Verna contends that the Fifth Circuit's analysis in *Lake Charles Stevedores* relied on the fact that, had the stevedore failed to provide its stevedoring services, the rice company responsible for hiring

---

[73] *Id.*

[74] *Id.*

[75] *Id.* at pp. 5–6.

[76] *Id.* at p. 6 (citing *Marine Fuel Supply & Towing, Inc. v. M/V Ken Lucky*, 869 F.2d 473 (9th Cir. 1989)).

[77] *Id.* (citing *M/V Ken Lucky*, 869 F.2d at 473).

[78] *Id.*

[79] *Id.*

the stevedore, and not the stevedore itself, would have been liable for breach of contract.[80] According to Verna, the rice company bore all the legal risk if the cargo was not timely delivered, no matter who it hired to perform the stevedoring services and physically load the rice, which demonstrated that the rice company, not the subcontracted stevedore, held the maritime lien.[81] Here, Verna argues, the Vessel owner likewise contracted with O.W. Malta to supply the fuel in question, and had Valero failed to provide fuel to the Vessel in Corpus Christi, the Vessel owner would not have had a breach of contract cause of action against Valero, but only against O.W. Malta.[82]

Verna contends that, unlike the fuel supplier in *Ken Lucky*, Valero was not selected by the owner to provide fuel to the Vessel, and therefore the circumstances underlying this lawsuit clearly present the same type of general contractor/subcontractor arrangement addressed in *Lake Charles Stevedores*.[83] In addition, Verna alleges that courts in other cases have reached the same result, including in *Galehead, Inc. v. M/V Anglia*, in which the Eleventh Circuit found that there was no maritime lien held by a company that provided fuel to a vessel because that company did so pursuant to an agreement with a bunkering agent, and not an agreement with the vessel's charterer.[84]

Furthermore, Verna argues that the contractual language that Valero included in its contract with O.W. USA does not bind the Vessel where neither the Vessel owner nor charterer were parties to the contract.[85] Verna asserts that Valero's reliance on the terms of its contract with O.W. USA to

---

[80] *Id.*

[81] *Id.*

[82] *Id.* at pp. 6–7.

[83] *Id.* at p. 7.

[84] *Id.* (citing 183 F.3d 1242 (11th Cir. 1999)).

[85] *Id.* at p. 8.

14

assert a lien against the Vessel is misplaced, as maritime liens are *stricti juris* and arise only by operation of law.[86] According to Verna, because maritime liens cannot be created by contract, the language Valero included in its Sales Contract with O.W. USA is irrelevant, and it is furthermore "equally fundamental that the Vessel owner cannot be bound to the terms of a contract to which it was not a party."[87]

Finally, Verna acknowledges that although the Fifth Circuit has made clear how the Court should rule on Plaintiff's lien claim, both parties can claim certain equities on their side of the dispute.[88] Verna asserts that it is understandable that Valero has claimed that it is entitled to be paid for the fuel it provided, but argues that it is equally understandable that the Vessel owner should not have to pay twice for the same quantity of fuel, a position it now faces.[89] Verna contends that the plaintiff knowingly exposed itself to the risk that it would not receive payment from O.W. USA and might not be able to assert a lien against the Vessel, such as if the Vessel had been lost at sea and the *res* had ceased to exist.[90] Verna asserts that Valero knowingly accepted that commercial risk, which it could have avoided by requiring O.W. USA to make an advance payment.[91] By contrast, Verna argues, the Vessel owner in this case cannot be said to have knowingly put itself in a position where it might have to make a double payment.[92]

---

[86] *Id.* (citing *Vestoil, Ltd. v. M/V Pioneer*, 148 F. App'x 898, 900–01 (11th Cir. 2005)).

[87] *Id.*

[88] *Id.* at p. 9.

[89] *Id.*

[90] *Id.*

[91] *Id.*

[92] *Id.*

Therefore, Verna argues, Valero expected and was entitled to payment from O.W. USA, and only sought to arrest the Vessel after the O.W. Bunker Group of companies declared bankruptcy.[93] Verna asserts that Valero's remedy is to assert a claim in the O.W. USA bankruptcy, not to arrest the Vessel which was owned by an entity with which Valero had no direct or indirect contractual relationship.[94]

### C.   *Valero's Arguments in Further Support of Summary Judgment*

In reply, Valero argues that Verna has failed to set forth any document or communication suggesting that the Vessel owner's order was not subject to a maritime lien.[95] Valero contends that it was the ultimate supplier who performed the Vessel owner's requested services, and therefore possesses a maritime lien as a matter of law under CIMLA.[96] Valero argues that the Ninth Circuit's decision in *Ken Lucky* is factually applicable and provides maritime authority that the mere existence of an intermediary does not defeat the supplier's maritime lien when furnishing bunkers on an order of a person or charterer authorized by statute to bind the vessel.[97] There, Valero asserts, the Ninth Circuit upheld the maritime lien despite the existence of a no-lien clause in the charter of the party ordering the bunkers.[98]

According to Valero, the important distinction in this case is that the order originated from

---

[93] *Id.* at p. 10.

[94] *Id.*

[95] Rec. Doc. 21 at p. 1.

[96] *Id.*

[97] *Id.* (citing *Marine Fuel Supply & Towing, Inc. v. M/V Ken Lucky,* 869 F.2d 473, 477 (9th Cir. 1988)).

[98] *Id.*

the Vessel's owner or charterer, and that Valero supplied the bunkers ordered by the owner.[99] Moreover, Valero contends, the owner knew from the outset that Valero would be the party actually supplying the bunkers to the vessel, as the O.W. Sales Order Confirmation sent to the owner at the time of the order expressly identified Valero as the "supplier."[100] Valero argues that the rule in *Ken Lucky* applies here because the owner ordered the bunkers, Valero issued a written confirmation that it would supply the owner's order, and the "Vessel's officer certified the bunkers were delivered subject to Valero's maritime lien and the Vessel's ultimate responsibility."[101]

Valero argues that Verna's reliance upon *Lake Charles Stevedores* is factually and legally misplaced, because there, the order for stevedoring services originated not from the vessel owner, as is the case here, but from a seller of rice to a subcharterer, and thus did not originate from the owner or a person authorized by the owner.[102] Valero argues that *Ken Lucky* was distinguished by the Fifth Circuit in *Lake Charles Stevedoring* as involving an order that originated from the subcharterer, who had authority to bind the vessel, as opposed to a situation in which general contractors have been engaged to supply a service and have called upon other firms to assist them in meeting their contractual obligations.[103] Here, Valero contends, the present case does not involve a general contractor supplying a service, but instead a bunker supplier selling a product to a vessel, the precise issue that was considered in *Ken Lucky*.[104] Furthermore, Valero alleges, the vessel's

---

[99] *Id.* at p. 2.

[100] *Id.* at p. 2 n.2.

[101] *Id.* at p. 2.

[102] *Id.*

[103] *Id.* at p. 3.

[104] *Id.*

officer in charge in *Lake Charles Stevedores* did not certify that the services were provided subject to a maritime lien and the vessel's ultimate responsibility, whereas here, in furtherance of the owner's order, the Vessel's officer in charge of the bunker delivery signed Valero's Bunker Certificate, expressly disallowing any disclaimer or waiver of Valero's maritime lien and acknowledging the "vessel's ultimate responsibility and liability" for payment.[105] Valero also asserts that *Galehead, Inc. v. M/V ANGLIA*, an Eleventh Circuit case relied upon by Verna, is also distinguishable because that case involved an intermediary who engaged a physical supplier to supply the vessel, and the physical supplier was fully paid, so the issue of whether it possessed a maritime lien was not before the court.[106]

Finally, Valero argues that although the Vessel's owner argues that it faces double-liability exposure, "the trader with whom the owner originally contracted (OW Interests) never had the expectation of earning anything more than its margin on the transaction."[107] By contrast, Valero argues, it supplied the actual bunker fuel, whose value it has lost, while the Vessel owner has received that fuel and paid no one, and thus the equities in the case favor Valero.[108] Valero disputes Verna's argument that it accepted the commercial risk which it could have avoided by requiring an advance payment, arguing that the Vessel owner clearly benefitted from that arrangement because it received bunkers on board without having to pay for them in advance—the trade-off for which was a maritime lien against the Vessel as security for its obligation to pay for the bunkers.[109] Valero

---

[105] *Id.* at pp. 3–4.

[106] *Id.* at p. 3 n.4. (citing 183 F.3d 1242 (11th Cir. 1999)).

[107] *Id.* at p. 4.

[108] *Id.*

[109] *Id.*

contends that "[n]othing could be more equitable than requiring Owner to pay Valero - the party who is actually out of pocket - for the value of the bunkers that Valero actually delivered to the Vessel and from which the vessel interests clearly benefitted."[110] Furthermore, Valero argues, the Vessel owner could plead any payment to Valero as a set-off against any obligation it may have to O.W. Malta—whom it also has not paid for the bunkers—in the pending London arbitration.[111]

### III. Law and Analysis

A.   *Standard on a Motion for Summary Judgment*

Summary judgment is appropriate when the pleadings, the discovery, and any affidavits show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[112] When assessing whether a dispute as to any material fact exists, the court considers "all of the evidence in the record but refrains from making credibility determinations or weighing the evidence."[113] All reasonable inferences are drawn in favor of the nonmoving party, but "unsupported allegations or affidavits setting forth 'ultimate or conclusory facts and conclusions of law' are insufficient to either support or defeat a motion for summary judgment."[114] If the record, as a whole, could not lead a rational trier of fact to find for the non-moving party, then no genuine issue of fact exists and the moving party is entitled to judgment as a matter of law."[115] The nonmoving party may not rest upon the pleadings, but must identify specific facts in the record and

---

[110] *Id.*

[111] *Id.*

[112] Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).

[113] *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398–99 (5th Cir. 2008).

[114] *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985); *Little*, 37 F.3d at 1075.

[115] *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986).

articulate the precise manner in which that evidence establishes a genuine issue for trial.[116]

The party seeking summary judgment always bears the initial responsibility of informing the Court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact.[117] To withstand a motion for summary judgment, a non-moving party must show that there is a genuine issue for trial by presenting evidence of specific facts.[118] Thus, the nonmoving party should "identify specific evidence in the record, and articulate" precisely how that evidence supports his claims.[119] The nonmovant's burden of demonstrating a genuine issue of material fact is not satisfied merely by creating "some metaphysical doubt as to the material facts," "by conclusory allegations," by "unsubstantiated assertions," or "by only a scintilla of evidence."[120] Rather, a factual dispute precludes a grant of summary judgment only if the evidence is sufficient to permit a reasonable trier of fact to find for the nonmoving party. Hearsay evidence and unsworn documents that cannot be presented in a form that would be admissible in evidence at trial do not qualify as competent opposing evidence.[121]

**B.    *Legal Standard for a Maritime Lien***

"The purpose of maritime liens is 'to enable a vessel to obtain supplies or repairs necessary to her continued operation by giving a temporary underlying pledge of the vessel which will hold until payment can be made or more formal security given.'"[122] Maritime liens may arise only by

---

[116]  *See, e.g.*, *Celotex*, 477 U.S. at 325; *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998).

[117]  *Celotex*, 477 U.S. at 323.

[118]  *Bellard v. Gautreaux*, 675 F.3d 454, 460 (5th Cir. 2012) (citing *Anderson*, 477 U.S. 242 at 248–49).

[119]  *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994), *cert. denied* 513 U.S. 871 (1994).

[120]  *Little*, 37 F.3d at 1075.

[121]  *Martin v. John W. Stone Oil Distrib., Inc*., 819 F.2d 547, 549 (5th Cir. 1987); Fed. R .Civ. P. 56(c)(2).

[122]  *Lake Charles Stevedores, Inc. v. PROFESSOR VLADIMIR POPOV MV*, 199 F.3d 220, 223 (5th Cir. 1999) (quoting *S. Coal & Coke Co. v. F. Grauds Kugniecibas ("The Everosa")*, 93 F.2d 732, 735 (1st Cir. 1937)).

operation of law, rather than by agreement of the parties.[123] In the United States, maritime liens are

largely governed by the Commercial Instruments and Maritime Liens Act ("CIMLA"), which in

relevant part provides that:

> (a) Except as provided in subsection (b) of this section, a person providing necessaries to a vessel on the order of the owner or a person authorized by the owner—
>> (1) has a maritime lien on the vessel;
>> (2) may bring a civil action in rem to enforce the lien; and
>> (3) is not required to allege or prove in the action that credit was given to the vessel.
> (b) This section does not apply to a public vessel.[124]

CIMLA defines "necessaries" as including "repairs, supplies, towage, and the use of a dry dock or

marine railway,"[125] and also provides that:

> (a) The following persons are presumed to have authority to procure necessaries for a vessel:
>> (1) the owner;
>> (2) the master;
>> (3) a person entrusted with the management of the vessel at the port of supply; or
>> (4) an officer or agent appointed by—
>>> (A) the owner;
>>> (B) a charterer;
>>> (C) an owner pro hac vice;
>>> (D) an agreed buyer in possession of the vessel.[126]

Although the supplier of necessaries may in certain circumstances be entitled to a maritime

---

[123] *Vestoil, Ltd. v. M/V M Pioneer*, 148 F. App'x 898, 900 (11th Cir. 2005); *see also Bird of Paradise*, 72 U.S. 545, 555 (1866); *Newell v. Norton*, 70 U.S. 257, 262 (1865) ("Maritime liens are not established by the agreement of the parties. . . . They are consequences attached by law to certain contracts, and are independent of any agreement between the parties that such liens shall exist. They, too, are *stricti juris*."); *Marine Oil Trading Ltd. v. M/T PAROS*, 287 F. Supp. 2d 638, 644 (E.D. Va. 2003) ("While a maritime lien does arise by operation of law rather than by agreement between the parties, there are a number of reasons for including contractual language alerting the parties to the existence of a lien on the ship. This language does not, however, actually give rise to the lien.").

[124] 46 U.S.C. § 31342.

[125] 46 U.S.C. § 31301(4).

[126] 46 U.S.C. § 31341(a).

lien, such liens are not automatic, but depend on the relationships between the various parties involved.[127]

**C.     Analysis**

The Fifth Circuit has recognized that two lines of cases address whether a maritime lien may be asserted in the absence of a contract between the supplier and a vessel: the general contractor/subcontractor line, and the principal/agent, or middle-man, line of cases.[128] In the general contractor/subcontractor line of cases, on which Verna relies, only the general contractor supplying necessaries on the order of an entity with authority to bind the vessel has a maritime lien, while subcontractors hired by those general contractors are generally not entitled to assert a lien on their own behalf, unless it can be shown that an entity authorized to bind the ship controlled the selection of the subcontractor and/or its performance.[129] By contrast, in the middle-man line of cases, which Valero urges the Court to apply here, despite a potentially large number of intermediaries, the ultimate supplier of the necessaries may obtain a maritime lien under certain circumstances.[130]

Valero argues that the latter line of cases, typified by the Ninth Circuit case of *Marine Fuel Supply & Towing, Inc. v. M/V Ken Lucky*, ought to apply.[131] *Ken Lucky* involved an order by a subcharterer for bunkers for a vessel, where the court ultimately found that because the subcharterer, which had the authority to bind the vessel to a contract, was the party that originated the order for

---

[127] *Martin Energy Servs., LLC v. M/V BOURBON PETREL*, Nos. 14-2986, 15-79, 15-81, 2015 WL 2354217, at *7 (E.D. La. May 14, 2015) (Fallon, J.) (citing *Lake Charles Stevedores, Inc. v. PROFESSOR VLADIMIR POPOV MV,* 199 F.3d 220, 229 (5th Cir. 1999)).

[128] *Lake Charles Stevedores*, 199 F.3d at 228–29.

[129] *Id.* at p. 229.

[130] *Id.*

[131] Rec. Doc. 14-1 at p. 9 (citing *Marine Fuel Supply & Towing, Inc. v. M/V Ken Lucky,* 869 F.2d 473, 476 (9th Cir. 1988)).

bunkers, the order subjected the vessel to a maritime lien despite the large number of intermediaries between the supplier and the vessel.[132] Verna, on the other hand, relies on *Lake Charles Stevedores, Inc. v. PROFESSOR VLADIMIR POPOV, MV*, a Fifth Circuit case in the general contractor/subcontractor line of cases that held that a stevedore who was hired by a shipper to load a cargo of rice onto a vessel was not entitled to a maritime lien.[133] In *Lake Charles Stevedores*, the Fifth Circuit held that because there was no evidence that the shipper had actual or apparent authority to employ stevedores on behalf of the vessel, or that an entity with authority to bind the vessel controlled the selection of the stevedore, the awareness on the part of the vessel's agents that the stevedore was supplying necessaries and its acceptance of the cargo was not sufficient to entitle the stevedore to a maritime lien.[134]

In *Lake Charles Stevedores*, the Fifth Circuit examined a number of middle-man cases, including *Ken Lucky*, and found the fact patterns inapplicable to the case before it. For example, the Fifth Circuit noted that a review of several middle-man cases revealed that the actual deliverer of necessaries to a vessel was not necessarily entitled to a lien, finding that the party contractually obligated to supply the necessaries could be entitled to a lien despite the fact that it had caused another supplier to actually deliver necessaries to a vessel.[135] Turning to *Ken Lucky*, the Fifth Circuit noted that, there, the supplier had been nominated by the vessel's owner to supply the vessel, and that with the exception of the fact that the master in *Lake Charles Stevedores* had, as in *Ken Lucky*,

---

[132]   *Ken Lucky*, 869 F.2d at 477.

[133]   Rec. Doc. 18-1 at pp. 5–6 (citing *Lake Charles Stevedores*, 199 F.3d at 228–29).

[134]   *Lake Charles Stevedores*, 199 F.3d at 231–32.

[135]   *Id.* at 229–30 (citing *Exxon Corp. v. Central Gulf Lines, Inc.* 780 F. Supp. 191, 194 (S.D.N.Y. 1991); *A/S Dan-Bunkering Ltd. v. M/V Zamet*, 945 F. Supp. 1576 (S.D. Ga. 1996)).

accepted the necessaries in question, the circumstances in *Ken Lucky* did not apply.[136]

      In *Lake Charles Stevedores*, the Fifth Circuit found a number of other facts that weighed in favor of finding a general contractor/subcontractor relationship rather than a middle man scenario. The Fifth Circuit noted that, in the situation before it, if Broussard, the company hired to deliver rice to the vessel, did not deliver the rice, it would have been liable for breach of its sales contract, which weighed in favor of finding that it, and not the ultimate supplier, held a maritime lien against the vessel.[137] The Fifth Circuit emphasized that the vessel owners retained no control over the selection of a stevedore, and that Broussard accepted all the risk in the event that the stevedoring services cost more than what the sales contract had provided.[138] The Fifth Circuit also noted that whether a contractor could be expected to hire subcontractors had been considered by courts in assessing whether the subcontractors had liens, but that courts had not generally suggested that such an expectation was sufficient to grant the requisite authority.[139] Additionally, the Fifth Circuit held that evidence that the vessel's owners or charterers were aware that a subcontractor would be used, or even that a particular subcontractor would most likely be used, did not necessarily create a maritime lien.[140]

      Finally, the Fifth Circuit noted that both the Ninth and Second Circuits require that an entity

---

[136] *Id.* at 230.

[137] *Id.*

[138] *Id.*

[139] *Id.* (citing *Stevens Technical Servs., Inc. v. United States*, 913 F.2d 1521, 1534 (11th Cir. 1990)). The Fifth Circuit distinguished *Stevens*, however, as having noted that the vessel's contract with the general contractor listed the subcontractor, the general contractor refused to take responsibility for the subcontractor's work, and that the vessel's operators dealt with subcontractor representatives in discussing, testing, and inspecting the subcontractor's work. *Id.* at 231.

[140] *Id.* at 231 (citing *Crescent City Marine Inc. v. M/V Nunki*, 20 F.3d 665, 668 (5th Cir. 1994); *S.C. State Ports Auth. v. M/V Tyson Lykes*, 67 F.3d 59, 60 (4th Cir. 1995)).

with authority to bind the vessel direct that the general contractor hire a particular subcontractor in order for that subcontractor to be entitled to a lien,[141] and that other courts had found a subcontractor to be entitled to a lien when subcontractors were identified and accepted by the vessel's owner or charterer prior to performance.[142] According to the Fifth Circuit in *Lake Charles Stevedores*, "[o]wner involvement in directing, testing, and/or inspecting subcontractor performance has also been cited in support of finding a lien in favor of a subcontractor."[143]

Here, Verna does not dispute that the fuel delivered by Valero constitutes "necessaries" under CIMLA.[144] Verna similarly does not contest that Almi, the agent for the owners of the Vessel, placed an order for 200 metric tons of bunkers with O.W. Bunker Malta, Ltd., which was ultimately supplied by Valero.[145] Furthermore, both parties agree that the Vessel's authorized vessel officer accepted the bunkers upon delivery and signed Valero's Bunker Certificate, although Verna contends that the officer did not accept the terms on the receipt and only acknowledged the amount of product received when presented with the receipt after all fuel had been delivered to the Vessel.[146]

However, Valero contends that O.W. Malta acted as an agent or broker for the Vessel, which Verna disputes.[147] In *Lake Charles Stevedores*, the Fifth Circuit held that "it is not whether an intermediary can be expected to supply the necessaries itself that distinguishes instances in which

---

[141] *Id.* (citing *Port of Portland v. M/V Paralla*, 892 F.2d 825, 828 (9th Cir 1989); *Farwest Steel Corp. v. Barge Sea-Span*, 828 F.2d 522, 526 (9th Cir. 1987); *Integral Control Sys. Corp. v. Consol. Edison Co.*, 990 F. Supp. 295, 301 (S.D.N.Y. 1998)).

[142] *Id.* (citing *Stevens*, 913 F.2d at 1525, 1534; *Turecamo of Savannah, Inc. v. United States*, 824 F. Supp. 1069, 1072 (S.D. Ga. 1993)).

[143] *Id.* (citing *Stevens*, 913 F.2d at 1535).

[144] Rec. Doc. 18-1 at p. 3.

[145] Rec. Doc. 18-3 at pp. 1–2.

[146] *Id.* at p. 3.

[147] *Id.* at p. 2.

the actual suppliers have liens, but it is rather the nature of the relationship between each pair of entities that are involved in the transaction at issue (e.g. agent vs. independent contractor)."[148] Verna does not appear to dispute that O.W. Malta issued, via O.W. USA, the order for Valero to supply the Bunkers.[149] If O.W. Malta acted as an agent for the Vessel, then it appears that the holdings of both *Ken Lucky* and *Lake Charles Stevedores* would suggest that the level of control exercised by O.W. Malta over the ultimate selection of Valero as the supplier would fit this case neatly with the middle-man line of cases. Therefore, in light of Verna's reliance on *Lake Charles Stevedores* and the arguments made by both parties, it appears that Verna would agree that if O.W. Malta was an agent of the Vessel with the authority to bind the Vessel to contracts, then Valero would indeed have a valid maritime lien.

"Agency is a legal relationship created by an express or implied agreement or by operation of law whereby the agent is authorized to act for the principal, subject to the principal's control."[150] Agency is never to be presumed; it must be shown affirmatively, and the party who asserts the existence of an agency relationship has the burden of proving it.[151] Although Valero claims in its statement of uncontested material facts that O.W. Malta was an agent of the Vessel, Valero fails to assert any facts supporting such a conclusion, and in fact argues that it need not show an agency relationship between O.W. USA or O.W. Malta and the Vessel in order to establish a maritime lien against the Vessel.[152] It appears, then, that Valero has abandoned any argument that O.W. Malta

---

[148]  *Id.*

[149]  *Id.*

[150]  *Karl Rove & Co. v. Thornburgh*, 39 F.3d 1273, 1296 (5th Cir. 1994).

[151]  *Id.*

[152]  Rec. Doc. 14-1 at p. 9.

acted as an agent of the Vessel, and is instead contending solely that the order from the Vessel's owners to O.W. Malta, requesting 200 metric tons of fuel, was sufficient to create a maritime lien that Valero may enforce against the Vessel.

The Court finds, however, that Valero fails to allege that the factors that the Fifth Circuit has noted could lead a court to find that a subcontractor is entitled to a maritime lien apply in this case. It is undisputed that Almi entered into a sales agreement with O.W. Malta;[153] had O.W. Malta failed to deliver the agreed-upon quantity of fuel, then, it would have been liable for breach of contract, a factor that the Fifth Circuit has stated weighs in favor of finding that O.W. Malta, rather than Valero, holds a maritime lien against the Vessel.[154] Valero contends that the owner knew from the outset that Valero would be the party actually supplying the bunkers to the vessel, as the O.W. Sales Order Confirmation sent to the owner at the time of the order expressly identified Valero as the "supplier."[155] However, although Valero is listed as the supplier on the Sales Order Confirmation, Valero points to no evidence suggesting that the Vessel directed that O.W. Malta hire a particular subcontractor, and the Fifth Circuit has noted that the mere knowledge that a particular subcontractor would be used does not necessarily create a maritime lien.[156] Valero does not contend that the Vessel owners specifically selected Valero or "nominated" that it supply the bunkers, as was the case in *Ken Lucky*, and Verna contends that the Vessel entities never had any dealings with

---

[153] Rec. Doc. 14-6.

[154] *Lake Charles Stevedores, Inc. v. PROFESSOR VLADIMIR POPOV MV,* 199 F.3d 220, 230 (5th Cir. 1999)

[155] Rec. Doc. 14-1 at p. 2 n.2.

[156] *Lake Charles Stevedores,* 199 F.3d at 231 (citing *Crescent City Marine Inc. v. M/V Nunki*, 20 F.3d 665, 668 (5th Cir. 1994); *S.C. State Ports Auth. v. M/V Tyson Lykes*, 67 F.3d 59, 60 (4th Cir. 1995)). *But see Stevens*, 913 F.2d at 1525, 1534; *Turecamo of Savannah, Inc. v. United States*, 824 F. Supp. 1069, 1072 (S.D. Ga. 1993) (suggesting that a subcontractor may be entitled to a lien when it was identified and accepted by the vessel's owner or charterer prior to performance).

27

Valero aside from acknowledging the amount of fuel delivered to the Vessel.[157]

On a motion for summary judgment, the party seeking summary judgment always bears the initial responsibility of informing the Court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact.[158] Here, however, Valero fails to present any evidence that O.W. Malta acted as an agent for the Vessel, nor does Valero point to any evidence that the Vessel owners either directed that Valero supply the bunkers or that the Vessel owners were involved in "directing, testing, and/or inspecting [Valero's] performance."[159] Therefore, the Court finds Valero has failed to show that it may assert a maritime lien against the Vessel solely on the basis that the Vessel entered into an agreement with O.W. Malta for 200 metric tons of fuel that were ultimately supplied by Valero, even considering that the Vessel owners seemingly knew, prior to performance, that Valero would ultimately supply the fuel in question.

Valero also argues that it is entitled to a maritime lien by virtue of the Authorized Vessel Officer's ratification of the agreement accepting and signing for the delivery.[160] Valero contends that in *Atlantic & Gulf Stevedore, Inc. v. M/V Grand Loyalty*, the Fifth Circuit expressly rejected the contention that prior authorization is required in order to find that a vessel's officer may authorize the provision of necessaries.[161] Valero alleges that, in furtherance of the owner's order, the Vessel's officer in charge of the bunker delivery signed Valero's Bunker Certificate, expressly disallowing

---

[157] Rec. Doc. 18-3 at p. 3.

[158] *Celotex*, 477 U.S. at 323.

[159] *Lake Charles Stevedores*, 199 F.3d at 231.

[160] Rec. Doc. 14-1 at p. 11 (citing *The Eastern*, 275 Fed. 874 (D. Mass. 1919); *Marine Fuel Supply & Towing, Inc. v. M/V Ken Lucky,* 869 F.2d 473, 476 (9th Cir. 1988); *Atl. & Gulf Stevedore, Inc. v. M/V Grand Loyalty*, 608 F.2d 197, 200 (5th Cir. 1979)).

[161] *Id.* at pp. 11–12 (citing *Grand Loyalty*, 608 F.2d at 202).

any disclaimer or waiver of Valero's maritime lien and acknowledging the "vessel's ultimate responsibility and liability" for payment.[162]

In *Lake Charles Stevedores*, the Fifth Circuit rejected the argument that a Vessel's mere acceptance of necessaries creates a maritime lien.[163] There, the Fifth Circuit noted that, pursuant to the contract between the Vessel's agent and Broussard, Broussard was obligated to deliver rice free-on-board the vessel.[164] Had the vessel's agents not allowed the stevedores to load the rice, they would have prevented Broussard from fulfilling its contractual obligations, and in such circumstances, the Fifth Circuit stated that it was hesitant to declare that the vessel had been subjected to liability.[165] Similarly, here, the Sales Agreement between Almi and O.W. Malta required the Vessel to ultimately receive the bunkers in question.[166] Allowing Valero to provide fuel to the Vessel and signing a receipt for the bunkers would not create a maritime lien where such actions were at least implicitly required by the contract between Almi and O.W. Malta, and where "[i]t is a settled principle of contract law that a contract requiring A to supply X to C is satisfied if B, hired by A, provides X to C."[167]

Similarly, the Court is unpersuaded by Valero's argument that the Bunkering Certificate's provision that "No disclaimer stamp of any type or form will be accepted on this bunkering certificate, nor, should any such stamp be applied, will it alter, change, or waive Valero's Maritime Lien against the vessel or waive the vessel's ultimate responsibility and liability for the debt incurred

---

[162] Rec. Doc. 21 at pp. 3–4.

[163] *Lake Charles Stevedores*, 199 F.3d at 231–32.

[164] *Id.* at p. 232.

[165] *Id.*

[166] Rec. Doc. 14-6 at p. 2.

[167] *Lake Charles Stevedores*, 199 F.3d at 232.

through this transaction" serves as evidence of a maritime lien. Maritime liens may arise only by operation of law, rather than by agreement of the parties, and thus the mere signature of a receipt alleging the existence of a maritime lien cannot create such a lien if the law does not do so.[168] Furthermore, it is irrelevant that Valero's "Bunker Contract" with O.W. USA states that Valero has relied on the credit of the Vessel in its contract with O.W. USA.[169] As noted by Verna, the Vessel was not a party to the Bunker Contract, and such a contract could not create a maritime lien.

---

[168] *See Vestoil, Ltd. v. M/V M Pioneer*, 148 F. App'x 898, 900 (11th Cir. 2005); *see also Bird of Paradise*, 72 U.S. 545, 555 (1866); *Newell v. Norton*, 70 U.S. 257, 262 (1865) ("Maritime liens are not established by the agreement of the parties. . . . They are consequences attached by law to certain contracts, and are independent of any agreement between the parties that such liens shall exist. They, too, are *stricti juris*."); *Marine Oil Trading Ltd. v. M/T PAROS*, 287 F. Supp. 2d 638, 644 (E.D. Va. 2003) ("While a maritime lien does arise by operation of law rather than by agreement between the parties, there are a number of reasons for including contractual language alerting the parties to the existence of a lien on the ship. This language does not, however, actually give rise to the lien.").

[169] *See* Rec. Doc. 14-3 at p. 2 ("IT IS UNDERSTOOD THAT IN CONSIDERATION OF EXTENDING THE ABOVE CREDIT TERMS, VALERO IS ALSO RELYING ON THE CREDIT OF THE ABOVE VESSEL AS UNDER U.S. LAW, AND VALERO EXPRESSLY RETAINS ITS RIGHT OF MARITIME LIEN AGAINST THE VESSEL. ANY ATTEMPT TO IMPAIR OR LIMIT SAID LIEN AGAINST THE VESSEL SHALL NOT BE ALLOWED.").

Therefore, neither the Bunker Contract nor the Bunkering Certificate, nor the Vessel's acceptance of Valero's bunkers, could create a maritime lien where, as here, Valero has failed to point to evidence that the Vessel's owners directed the selection of Valero or otherwise retained sufficient control over the subcontractor's performance such that the Vessel became subject to a maritime lien held by Valero.

### IV. Conclusion

Accordingly,

**IT IS HEREBY ORDERED** that Valero's "Motion for  Summary Judgment"[170] is **DENIED.**

**NEW ORLEANS, LOUISIANA,** this 28th day of December, 2015.

**NANNETTE JOLIVETTE BROWN**
**UNITED STATES DISTRICT JUDGE**

---

[170] Rec. Doc. 14.

31