IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| VALERO MARKETING AND SUPPLY COMPANY | * | Civil Action No. 14-2712-NJB-KWR |
| v. | * | Filed Under Rule 9(h) Fed. R. Civ. P. |
| | * | (Admiralty) |
| M/V ALMI SUN, IMO NO. 9579535, her engines, apparel, furniture, equipment, appurtenances, tackle, etc., *in rem*, | * * * | |

**<u>OPPOSITION TO CROSS MOTION FOR SUMMARY JUDGMENT</u>**

MAY IT PLEASE THE COURT:

Plaintiff, Valero Marketing and Supply Company ("Valero"), respectfully submits this Opposition to the Cross-Motion of Claimant, Verna Marine Co., Ltd. ("Verna") for Summary Judgment. Valero requests that the Court deny the cross-motion for the reasons asserted herein.

**FACTUAL STATEMENT**

In October of 2015, Verna, a foreign entity, needed fuel ("bunkers") for its foreign flag vessel, the ALMI SUN, while in Corpus Christi, Texas. Almi Tankers S.A. ("Almi Tankers"), Verna's agent and technical manager of the ALMI SUN,[1] contacted OW Bunkers Malta, Ltd., ("OWB Malta"),[2] another foreign entity, to arrange for the purchase and delivery of bunkers to the ALMI SUN in Corpus Christi. Verna and Almi Tankers knew that OWB Malta could not itself supply and deliver the bunkers,[3] and would have to assign a domestic (American) supplier to do so.[4] Valero, the only local bunker in Corpus Christi,[5] agreed to supply and deliver the bunkers subject to the standard maritime lien recognized under U. S. law in favor of American

[1] Corporate deposition of Verna Marine Co., Ltd., portions of which are attached as Exhibit A, at pp. 8-9. Verna was responsible for appointing agents for owners for provisioning, including bunkering, of the vessel. *Id.* at p. 10.
[2] *Id.* at p. 22-23, Sales Order Confirmation, R. Doc. 14-2.
[3] Deposition, attached as Exhibit A, at 27.
[4] *Id.* at p. 26.
[5] See Second Declaration of Lori Francis, attached as Exhibit B at ¶ 3.

suppliers to secure payment for bunkers supplied to foreign vessels.[6] OWB Malta notified the ALMI SUN that Valero would supply and deliver the bunkers;[7] and Almi Tankers agreed to the supply and delivery by Valero.[8] Thereafter, the logistical supply and delivery of the bunkers were coordinated between Moran Gulf Shipping, the local agent of the vessel, and Kirby Marine, Valero's agent and barge bunkering contractor. See October 24, 2014 e-mail from Almi Tankers to master of the ship, confirming that bunkers to be delivered by Valero and instructing the captain:

> Please coordinate with the agents [Moran Gulf, the local agent for the ship, who is also copied on the e-mail] for prompt delivery avoiding any delays and keep them regularly posted with your ETA.

The same e-mail instructed the agents, Moran Gulf:

> Please coordinate with the suppliers [Valero and its agents] and the master and do your outmost [sic] the bunkers to be delivered without delays.[9]

Valero made the delivery; and the authorized officer of the ALMI SUN signed Valero's bunker receipt, accepting the delivery and acknowledging the vessel's "ultimate responsibility and liability for the debt incurred through this transaction." [R. Doc. 14-4.][10]

This transaction occurred over fourteen months ago. The ALMI SUN has consumed the bunkers; and to date, Verna has not paid anyone for the bunkers, *id.* at p. 4 of 4, n. 11;[11] see also, declaration of Lori Francis, R. Doc. 14-2, at p. 2 of 3, No. 7. It is undisputed that Valero is owed $124,388.24 for those bunkers. See Verna's Response to Plaintiff's Proposed Statement of Uncontested Material Facts, R. Doc. 18-3, p. 3 of 4, at Nos. 6 and 9.

## ARGUMENT

### I. CIMLA Protects American Suppliers of Necessaries Like Valero

[6] Bunkering Certificate, R. Doc. 14-4, deposition at pp. 35, 45.
[7] Deposition, Exhibit A, at pp. 26-7.
[8] *Id.* at p. 26.
[9] See string of e-mails on October 24, 2014, attached as Exhibit C.
[10] See also two e-mails dated October 27, 2014, attached as Exhibit D, confirming delivery.
[11] See also stipulation by counsel, deposition, Exhibit A, at 50.

The Federal Maritime Lien Act is codified within the Commercial Instruments and Maritime Liens Act (CIMLA), 46 U.S.C. §§ 31341, *et seq.* The key provision of the Act provides that "a person providing necessaries to a vessel on the order of the owner or a person authorized by the owner – (1) has a maritime lien on the vessel; (2) may bring a civil action to enforce the lien; and (3) is not required to allege or prove in the action that credit was given to the vessel." 46 U.S.C. § 31342(a).

> The purpose of CIMLA is to protect American suppliers of goods and services. In *Tramp Oil and Marine, Ltd. v. M/V Mermaid I,* 805 F.2d 42, 46 (1st Cir. 1986),[12] the First Circuit quoted the Fifth Circuit's recognition of this purpose: The primary concern of the Federal Maritime Lien Act is the protection of American suppliers of goods and services. See H. Rep. No. 92-340, 92nd Cong., 1st Sess., reprinted in 1971 U.S. Code Cong. & Ad. News 1363-65; *Gulf Trading & Transportation Co. v. The Vessel Hoegh Shield*, 658 F.2d 363, 367 (5th Cir. 1981), *cert. denied*, 457 U.S. 1119, 102 S.Ct. 2932, 73 L.Ed.2d 1332 (1982)("The congressional intent is that an American supplier of goods, services or necessaries to a foreign vessel obtains a maritime lien in the vessel when the goods or services are supplied or performed in the United States.").

---

[12] *See also Gulf Trading & Transp. Co. v. M/V TENTO*, 694 F.2d 1191, at 1194 (9th Cir. 1982), where the court said:

> When it amended the maritime lien provisions of the Ship Mortgage Act, 46 U.S.C. ch. 25, §§ 911-84 (1976), Congress demonstrated its intent that maritime liens be enforced even if it was the charterer rather than the owner who ordered the supplies giving rise to it. [citation omitted]. Before the amendment had been passed, it appeared that a prohibition of lien clause in a charter party barred the supplier from acquiring a lien on a vessel for necessaries furnished to it. The statute then in effect permitted a supplier to acquire such a lien despite a prohibition of lien clause in the charter agreement. Faced with a situation similar to the one before this court, Congress determined that the vessel, and not the American supplier, should bear the burden when a charterer has not paid for its supplies. The legislative history stated:
>
> > Your Committee gave careful consideration to this problem of American materialman where the owner, by chartering or surrendering possession of the vessel, clothes the master thereof with at least apparent authority to bind the vessel for necessaries furnished to the vessel. The question presented was where a loss occurs in this situation, whether it should be suffered by the owner of the vessel, or the American materialman who furnishes such necessaries in good faith.
> >
> > After careful consideration of the entire record, your Committee has concluded that, as a matter of equity, the owner should bear the loss in such a situation.
> >
> > As a practical matter, the owner can more easily protect himself contractually by bonds or otherwise at the time he charters the vessel, than can the American materialman who furnishes necessaries to a vessel under great economic pressure to put back to sea.

H.R. Rep. No; 92-340, 92nd Cong., 1st Sess. 1, 3, reprinted in [1971] U.S. Code Cong. & Ad. News 1363, 1365.

Valero's provision of bunkers to the ALMI SUN in Corpus Christi completely satisfied the standard for establishing its maritime lien against the ALMI SUN. As the technical manager of the ALMI SUN and Verna's agent, Almi Tankers was authorized to order the bunkers for the vessel. Further, Almi Tankers knew that the middleman, OWB Malta,[13] could not itself supply the bunkers and would have to order the supply and delivery of the bunkers through a domestic (US) bunker provider, Exhibit A at p. 27. OWB Malta thus issued its Sales Order Confirmation notifying Almi Tankers that Valero would be the US supplier. See R. Doc. 14-2 and see Exhibit A at pp. 26-7. Almi Tankers accepted Valero as the supplier, and the delivery was coordinated through Moran Gulf Shipping Agency, the vessel's local agent, with the ship's officers approving the delivery and acknowledging the vessel's responsibility for same. *Id.* at pp. 30, 31, 34, 52-3.

Under these facts, CIMLA mandates recognition of Valero's lien. Valero delivered the bunkers to the ALMI SUN exactly as Almi Tankers ordered - both in quality and quantity; and Verna, as claimant of the vessel, cannot accept and consume the bunkers and then simply deny Valero its maritime lien because it used an intermediary to order its bunkers.

Under CIMLA, it makes no difference if the order for bunkers was channeled through a middleman. See, *e.g. Marine Fuel Supply & Towing, Inc. v. M/V KEN LUCKY*, 869 F.2d 473 (9th Cir. 1988). Obviously, the middleman expected only to receive a small margin. From a policy perspective, it makes no sense to deny an American physical supplier of bunkers a maritime lien when the original order emanated from the ship's owner or its authorized agent and the shipowner or its authorized operator (Almi Tankers) knew that the intermediary would have to engage a U.S. physical supplier to deliver the necessaries, was informed of and accepted the supplier before delivery and interacted with the supplier's agent in bunkering the ship and

[13] O.W. USA meanwhile, the local middleman – subsidiary of a foreign OWB Malta entity, did not physically supply bunkers and has not intervened or appeared to claim payment or entitlement to a lien.

retaining samples. *See e.g., Crescent City Marine, Inc. v. M.V. Nunki*, 20 F.3d 665, 667 (5th Cir. 1994) (Fifth Circuit noted that "in the 'agent/broker' or 'middle-man' cases there were as many as five layers between the owner of the vessel and the service provider, yet the service provider was still permitted a lien against the vessel."); see also *Lake Charles Stevedores,* 199 F.3d at 231 ("In other cases in which subcontractors have been found to be entitled to a lien, those subcontractors were identified and accepted by the vessel's owner or charterer prior to performance.").

By contrast, denying an American physical supplier a maritime lien not only financially harms that supplier, but also creates a major disincentive to supply goods on credit to foreign ships calling at U.S. ports. That disincentive harms commerce by (1) limiting the number of necessary suppliers that will provide such goods on credit, which in turns drives up the cost of such goods, (2) leads to pre-payment requirements, which drives up transactional costs, (3) slows the pace of maritime commerce, and (4) ultimately reduces the number of American suppliers of necessaries.

All the foregoing outcomes are completely contrary to CIMLA's goal of promoting U.S. maritime commerce. Moreover, the idea that a direct relationship must exist between Valero as physical supplier and the ship owners ignores the business reality that middlemen, such as OWB Malta, are commercially disinclined to disclose their business contacts up and down the chain in order to preserve and perpetuate their own interests.

## II. *The Res Cogitans* Ruling

Verna cites the recent ruling of the English Court of Appeal in *The Res Cogitans* [2015] EWCA Civ. 1058 [Doc. 29-2], as authority that recognition of the U.S. maritime lien would expose Verna to double payments. Verna's argument is misplaced. *The Res Cogitans* decision

does not impose liability upon Verna "to pay for the same fuel twice," as contended by Verna, and in fact did not rule on the vessel owner's liability to any party. Doc. 29-1, p. 2.

The dispute in *The Res Cogitans* arose out of a delivery of bunkers by OWB Malta to *The Res Cogitans* in Taupse, Russia. The bunkers had been supplied by a "sub-seller," RN-Bunker, Ltd. ("RNB"). After delivery, the parent of OWB Malta applied for restructuring; and the OWB Malta parent's bank asserted a right against the vessel owner, not the vessel, to recover the debt of owner to OWB Malta for the bunkers. An affiliate of RNB claimed ownership of any non-consumed bunkers and sought payment for any consumed bunkers. The vessel owner denied all claims of all parties, contending, in part, that it did not owe for the bunkers because OWB Malta had not paid for the bunkers and therefore could not pass title in the bunkers to the vessel owner.

The crux of the issue before the English Court of Appeal was whether the transaction between vessel owner and OWB Malta was governed by the English Sale of Goods Act of 1979. The Court ruled that the "transfer of property [title] in the bunkers was not fundamental to the parties' contract"; and held that the vessel owner could not defeat its liability for payment on the basis that OWB Malta could not transfer title. Importantly, the Court of Appeal did not rule on the owner's liability for the bunkers; the respective rights of the different interests; and in no way held, indicated, or even implied that the vessel owner could be liable to pay twice for the bunkers.

Factually, and contractually, *The Res Cogitans* decision bears no relevance to the case before this Court. It did not concern a maritime lien against the vessel; and none of the transactions therein involved deliveries of bunkers in the United States. The sole holding under English law is that the vessel owner could not raise OWB Malta's non-payment as a complete defense to its liability to pay for the bunkers it had received and consumed. Nothing therein imposed any double liability upon a vessel owner.

## III. Verna's Plea for Equity Is Misplaced

Verna has no standing to plead equity. *The Res Cogitans* ruling does not release Verna from its obligations to pay the bunkers merely because OWB Malta has not paid for the bunkers and that decision does not expose Verna to a double payment.

In light of Almi Tankers' pre-delivery knowledge that OWB Malta could not provide or deliver the bunkers, Almi Tankers' acceptance of Valero as supplier, and the ship's officer's acknowledgment that its vessel has "ultimate responsibility and liability for the debt," Almi Tankers and, through it, Verna were on notice of Valero's right to a lien. Equitably, Verna and the ALMI SUN are not entitled to accept Valero as the supplier, approve the delivery, use the bunkers and then deny liability for payment because it used a middleman.

Factually, OWB Malta expected to earn only a few percentage points for serving as agent in the transaction, Doc. 14-2. at p. 2 of 3, No. 5, with Valero to be paid its invoiced amount, I*d.* at p. 2 of 3, No. 7. Indeed, Almi Tankers has acknowledged its right to pay Valero and hold any balance due OWB Malta to pay it. See November 7, 2014 email from Almi Tankers S.A. to O.W. Bunker, attached as Exhibit E; Deposition, Exhibit A, at pp. 47-49.

Legally, the sole question before the Court is whether Valero has a maritime lien against the ALMI SUN for providing and delivering the bunkers to the ship. It is undisputed that the provision of necessaries to a ship in the United States gives rise to a maritime lien. Valero is the only party asserting alien; and neither OWB Malta nor OWB USA has arrested the vessel or intervened in Valero's arrest and civil suit asserting its lien.

## IV. *Lake Charles Stevedores* is Distinguishable

The linchpin of Verna's legal argument is *Lake Charles Stevedores v. PROFESSOR VLADIMIR POPOV MV*, 199 F.3d 220 (5th Cir. 1999). However, there are critical differences

between the instant case and *Lake Charles Stevedores* which demonstrate that Valero is indeed entitled to its lien for supplying bunkers.

First, the *Lake Charles Stevedoring* court characterized the case before it as "more akin to those in which general contractors have been engaged to supply a service and have called upon other firms to assist them in meeting their contractual obligations." 199 F.3d at 230. This is factually and legally significant because the stevedoring services of Lake Charles Stevedore, the claimant, was only one of several services that Broussard Rice Mill, the seller and domestic supplier, undertook under its contract with the vessel. Specifically, Broussard agreed to supply and sell the rice, with contract price per ton to cover "the costs of bags to contain the rice, of freight from the mill to the dock, of unloading the trucks, and of stowing and trimming (i.e. stevedoring services)." *Lake Charles Stevedores, Inc.*, 199 F.3d at 221. Lake Charles Stevedores filed its claim, asserting a maritime lien against for its discrete, small part of Broussard's obligation to the vessel. Thus the Court treated the stevedore as a "sub-contractor," not as the principal supplier under the contract.

By contrast, the instant case, like *Marine Fuel Supply and Towing, Inc. v. M/V KEN LUCKY*, 869 F.2d 473 (9th Cir. 1988), involved a single bunker supplier selling a single marine necessary product – marine fuel, to a vessel. R. Doc. 21 at p. 3 of 5. Thus, the *KEN LUCKY* court recognized that the sole direct physical provider and supplier was entitled to a maritime lien, despite the existence of intervening middlemen in the bunker transaction.

Further, unlike *Lake Charles Stevedores*, the authorized officer of the M/V ALMI SUN signed the bunkering certificate, R. Doc. 14-4, acknowledging the vessel's "ultimate responsibility." The bunker certificate speaks for itself and is binding on the vessel. Verna does not contest that the bunkering certificate was signed by him as an "Authorized Vessel Officer," despite counsel's unsupported contention that "the vessel officer only acknowledged

the amount of the product received but he did not have the intention or authority to agree to terms on Valero's bunker certificate or receipt" [Verna's Response to Plaintiff's Proposed Statement of Uncontested Material Fact, R. Doc. 18-3 at p. 3 of 4, No. 8]. Certainly, had the vessel officer stamped or contested any of the terms of the bunkering certificate, or "no lien" clause, his authority would be binding on and effective against Valero. See, *e.g. Ferromet Resources, Inc. v. Chemoil Corporation*, 5 F.3d 902 (5th Cir. 1993).

Verna's unsupported contention that the vessel officer did not have the authority or intention to agree to the terms on the vessel's bunker certificate is wholly unavailing to factually or legally defeat Valero's lien. His signing and stamping the certificate [Verna's Response to Plaintiff's Statement of Uncontested Material Facts, R. Doc. 18-3, p. 3 of 4, at No. 8], by themselves acknowledge and ratify Valero's lien on the vessel. *See e.g., Atl. & Gulf Stevedores, Inc. v. M/V Grand Loyalty,* 608 F.2d 197, 202 (5th Cir. 1979) ("We do not believe, however, that the sequencing of events is sacrosanct to the securing of the protections of a lien in a case as is here presented. Prior authorization is not an essential to preserving a lien position. We are cited to no authority in support of this interpretation. We reject same. Whether a lien is available must be determined by a fair consideration of the totality of the circumstances. Certainly prior authorization would be most relevant and material. But we do not interpret the provisions above cited to require prior authorization. <u>Authorization, actual or fairly presumed, given prior to or during rendition of services, or ratified subsequent to rendition will suffice.</u> *See Jan C. Uiterwyk Co., supra*, which spoke to subsequent ratification as being sufficient. In light of what we discern as the congressional intent, as well as noting this court's more expansive view of § 971, we must reject the overly restrictive prior authorization requirement."); *Jan C. Uiterwyk Co. v. MV Mare Arabico*, 459 F. Supp. 1325, 1331 (D. Md. 1978) (emphasis added) ("Whichever entity may have actually ordered the performance of services by plaintiffs, the services were furnished

to the MARE ARABICO and the MARE AUSTRALE, they were accepted by the ships' masters, the vessels themselves benefitted from their performance and the ordering of the services was ratified by the ships' masters on behalf of the owner and by representatives of the charterer."); *see also Galehead, Inc. v. M/V GOODPAL*, No. C98-0148, 1999 WL 1488986, at *2 (W.D. Wash. Jan. 20, 1999) ("Here, the vessel master, a person clearly within the statutory presumption, signed the receipts, thereby affirmatively accepting both the stevedoring and towing services from LCS and HDTS. This, in the Court's opinion, demonstrates that a person fairly presumed to possess the owner's authorization ratified Portserv's order subsequent to performance. As a result, Portserv is entitled to the statutory presumption under the agency theory of ratification, and plaintiff thereby holds enforceable maritime liens."); *Reinholm Crane & Rigging Co. v. M/V Ocean Crown*, 484 F. Supp. 935, 936 (W.D. Wash. 1979).

In any event, *Lake Charles Stevedores* recognized that physical suppliers have been entitled to maritime liens when the owner or charterer identified and accepted the physical supplier prior to performance, 199 F.3d at 231, which is precisely what happened in this case.

## V. Verna and the ALMI SUN Accepted Valero as the Sole Supplier of Bunkers

Almi Tankers knew that OWB Malta could not supply the bunkers in Corpus Christi. The sales order confirmation (R. Docs. 14-6 and 19-2) issued by OWB Malta to Almi Tankers S.A., the agent for the owners of the M/V ALMI SUN, designates Valero to supply the bunkers. The sales order confirmation was issued on October 24, 2014 prior to the scheduled delivery date of October 25, 2014. See *id.* Moreover, Owner's corporate representative testified at deposition that Owners knew Valero would be the physical supplier prior to delivery. See Corporate Deposition of Verna, at p. 26. The vessel interests accepted OWB Malta's designation of Valero as the sole domestic party to provide and deliver bunkers to the vessel in Corpus Christi, Texas.

While Valero disputes that this is a "subcontractor" case, the Fifth Circuit stated in *Lake Charles Stevedores*, *supra*, that whether a contractor could be expected to hire subcontractors has been considered in assessing whether the subcontractors have liens. See *Galehead*, 183 F.3d at 1246 (noting that contractor was seemingly capable of performing under its agreement without resort to subcontractors); *Stevens Technical Services, Inc. v. United States*, 913 F.2d 1521, 1534 (11th Cir. 1990) (noting that the owner knew contractor was incapable of doing the work itself). *Lake Charles Stevedores*, 199 F.3d at 230; see also, *Turecamo of Savannah, Inc. v. United States*, 824 F.Supp. 1069, 1072 (S.D. Ga. 1993). Owner involvement in directing, testing, and/or inspecting subcontractor performance has also been cited in support of finding a lien in favor of a subcontractor. See *Stevens*, 913 F.2d at 1535; *cf. Marine Coatings*, 932 F.2d at 1375 n. 9 (listing operator's inspecting subcontractor work and giving provisional and final acceptance to work performed by the subcontractor among evidence that supported court's conclusion that a genuine issue of fact existed regarding general contractor's authority to bind the vessel). *Id.* at 231.

In this case, Almi Tankers (1) knew that OWB Malta engaged Valero to supply bunkers to the vessel before the bunkers were delivered; (2) accepted Valero's as the supplier of bunkers; (3) inspected and confirmed the performance by Valero [See R. Doc. 18-3, p. 3 of 4, at No. 8]; (4) arranged for its agents to coordinate the bunker delivery with Valero and its agents; and (5) through its "authorized officer," acknowledged the "vessel's ultimate responsibility and liability for the debt" to Valero for the bunkers.

## VI. Valero Has Established It Possesses a Maritime Lien Claim

By express terms, CIMLA does not require proof of agency. Instead, only three elements need be proven: (1) necessaries were provided, (2) to a ship, (3) on the order of the owner or a person authorized by the owner. 46 U.S.C. § 31342. There is no dispute that Valero provided necessaries (bunkers) to a ship (the *ALMI SUN*). The only issue in dispute is whether Valero did

so "on the order of the owner or a person authorized by the owner." Valero respectfully submits that the evidence establishes that Verna/Almi Tankers knew that OWB Malta could not supply the bunkers in Corpus Christi that OWB Malta notified Verna/Almi Tankers that Valero would be the supplier in Corpus Christi, that Verna/Almi Tanker accepted that assignment and that the ship's officer's acknowledged the ship's responsibility to pay for the bunkers. The strictures of the statute have been established; and Valero is entitled to its lien as a matter of law.

*Ken Lucky* is the only circuit court opinion on point. *Marine Fuel Supply & Towing, Inc. v. M/V Ken Lucky*, 869 F.2d 473 (9th Cir. 1988). The Ninth Circuit's decision in *Ken Lucky* is factually applicable and provides maritime authority for the proposition that the existence of an intermediary does not defeat the supplier's maritime lien when furnishing bunkers on an order of a person [a charterer] authorized by statute to bind the ship. *Id*. at 477. There, the court said:

> The parties agree that the order originated from Bulkferts [the subcharterer]. Thus, we need not reach the question whether the district court's conclusion that Brook [the middle man bunker broker] was not Bulkferts' agent is erroneous because appellees have already admitted that the fuel and the bunkers were sold to Bulkferts. **We conclude that Marine Fuel [the physical supplier] need not establish agency between Brook and Bulkferts to fall within the scope of one entitled to a maritime lien under the Act.**
>
> *Ken Lucky concedes that Bulkferts was authorized to bind the vessel. It is clear that Eurostem, as managing agent for Bulkferts, did order the fuel and it is also clear that Marine Fuel delivered the fuel to the vessel.* Section 971 states that any person furnishing supplies or other necessaries *to a vessel* "upon" the order of a person authorized to bind the vessel shall be entitled to lien. It is clear that Eurostem, as managing agent for Bulkferts, ordered the fuel, and it is also clear that Marine Fuel delivered the fuel to the vessel. Bulkferts had statutory authority to order the fuel under Section 972 and it did so. Marine Fuel delivered the fuel to the vessel after Bulkferts ordered it. Thus, this case can be easily distinguished from the situation presented in *Farwest II*.[14] *(italics in original).*

*Id*. In *Ken Lucky*, the subcharterer (Bulkferts) would ordinarily pay the intermediary (Brook), 869 F.2d at 475 n.1, and the physical supplier (Marine Fuel) sought payment from one intermediary

[14] *Farwest II* involved the "restrictive repair contract line of cases" in which the court held that a general contractor did not qualify as an "authorized person" to bind the vessel under the earlier version of CIMLA. *Id*., *citing Farwest Steel Corp. v. Barge Sea-Span*, 828 F.2d 522, 525-26 (9th Cir. 1987).

(Gray) and then another (Brook). 869 F.2d at 475. No contract existed between the physical supplier and Bulkferts, and the Ninth Circuit specifically held that no proof of agency was required between Bulkferts and Brook. 869 F.2d at 477.

The table below compares the progression of each order from origination until fulfillment in the *Ken Lucky* case and the present case:

| | |
|---|---|
| *Ken Lucky* | Bulkferts (sub-charterer)/Eurostem Maritime Limited (managing agent) → Brook Oil → Gray Bunkering → Marine Fuel → Ship |
| *ALMI SUN* | Verna (owner) → O.W. Malta → O.W. Bunker USA → Valero → Ship |

As the table illustrates, the progression of the bunker orders in *Ken Lucky* and in this case are substantively identical. The only distinction is that instead of the order originating from a sub-charterer, the order that Valero fulfilled originated from Almi Tankers, the ship's technical manager/operator, and there were fewer intermediaries between Valero and the ship. This distinction is immaterial, since under CIMLA, both the owner and the operator are presumed to have authority to order necessaries.

As in *Ken Lucky*, Valero was not a subcontractor of a separate activity unrelated to Almi Tankers' order for necessaries. Thus, the rule in *Ken Lucky* applies with dispositive force because Almi Tankers ordered OWB Malta to obtain bunkers in Corpus Christi and then approved Valero as the actual bunker supplier with its ship's officer acknowledging the debt of the vessel. *See also, Belcher Co. of Alabama, Inc. v. M/V Maratha Mariner*, 724 F.2d 1161, 1163-64 (5th Cir. 1984) (physical bunker supplier, which contracted through a broker, delivered bunkers to a ship that had been ordered by the charterer's agent; Fifth Circuit noted in *dicta* that "[i]f American law had been applicable when the vessel was attached in the Netherlands, the supplier of fuel would have had a lien on the vessel and an action *in rem* could have been

brought to enforce the maritime lien."); *see also Tramp Oil and Marine, Ltd. v. M/V Mermaid I*, 805 F.2d 42, 44 (1st Cir. 1986) (whether broker in the midst of a five-party middle-man scenario was entitled to a maritime lien; the court noted, however, that "[n]o one disputes that Exxon and Colonial, as direct suppliers of the fuel to the Mermaid, would be entitled to a maritime lien. Fuel is unquestionably a "necessary" within the meaning of the Act, and it was furnished upon the order of someone with authority to do so.").

**VII. Conclusion**

WHEREFORE, for the foregoing reasons and those set forth in its summary judgment pleadings, Plaintiff, Valero Marketing and Supply Co., prays that the Cross Motion of Claimant, Verna Marine Co., Ltd. for Summary Judgment be denied.

Respectfully submitted,

/s/ Michael H. Bagot, Jr.

MICHAEL H. BAGOT, JR. (#2665)
THOMAS J. WAGNER (#13143)
THOMAS A. RAYER, JR. (#20581)
WAGNER, BAGOT & RAYER, LLP
Pan American Life Center – Suite 1660
601 Poydras Street
New Orleans, Louisiana 70130
Telephone: 504-525-2141
Facsimile: 504-523-1587
E-mail: mbagot@wb-lalaw.com
E-mail: twagner@wb-lalaw.com
Attorneys for Plaintiff, Valero Marketing and Supply Co.

**CERTIFICATE OF SERVICE**

I hereby certify that on January 26, 2016, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system, and notice will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. All other parties will be served by regular U.S. Mail and may access this filing through the Court's system.

/s/ Michael H. Bagot, Jr.

MICHAEL H. BAGOT, JR.

G:\942-10\PLDG\0021AAA – TJW