**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **VALERO MARKETING AND SUPPLY CO.** | **CIVIL ACTION** |
| **VERSUS** | **NO.  14-2712** |
| **M/V ALMI SUN, IMO NO. 9579535, her engines, apparel, furniture, equipment, appurtenances, tackle, etc.,** *in rem*, | **SECTION: "G"(4)** |

<u>**ORDER**</u>

Before the Court is Verna Marine Co. Ltd.'s ("Verna") "Cross Motion for Summary Judgment,"[1] wherein it contends that it is entitled to summary judgment in its favor finding that Plaintiff Valero Marketing and Supply Co. ("Valero") does not have a maritime lien claim against the M/V Almi Sun, IMO No. 9579535 ("Vessel").[2] Having considered the motion, the memoranda in support and in opposition, the oral arguments made at the hearing on the motion, the record, and the applicable law, the Court will grant the motion.

## I. Background

### A.    *Factual Background*

This lawsuit arises out of a dispute wherein Valero, a marine fuel supplier, alleges that it supplied approximately 200 metric tons of marine bunker fuel to Vessel, owned by Verna Marine Co. Ltd. ("Verna"),[3] on or about October 25, 2014 at Corpus Christi, Texas, for which it was never paid.[4] Valero contends that it entered into a maritime contract for the supply of fuel bunkers to the

---

[1]  Rec. Doc. 29.

[2]  Rec. Doc. 14.

[3]  Verna has appeared in these proceedings solely and restrictively as *in rem* claimant of the Vessel.

[4]  Rec. Doc. 1 at p. 2.

1

Vessel ("Bunker Contract") with O.W. Bunker USA, Inc. ("O.W. USA"), which Valero alleges

acted as an agent or broker for the vessel.[5] The Bunker Contract required payment for the bunkers

within 30 calendar days of delivery and provided for the accrual of interest on any late payments.[6]

The Bunker Contract also contained a provision stating:

> IT IS UNDERSTOOD THAT IN CONSIDERATION OF EXTENDING THE
> ABOVE CREDIT TERMS, VALERO IS ALSO RELYING ON THE CREDIT OF
> THE ABOVE VESSEL AS UNDER U.S. LAW, AND VALERO EXPRESSLY
> RETAINS ITS RIGHT OF MARITIME LIEN AGAINST THE VESSEL. ANY
> ATTEMPT TO IMPAIR OR LIMIT SAID LIEN AGAINST THE VESSEL SHALL
> NOT BE ALLOWED.[7]

In a practice common to the marine bunker fuel industry, O.W. Bunker Malta Ltd. ("O.W.

Malta") received requests from vessel owners or charterers, which it would then send to O.W. USA,

who then selected a local fuel supplier—in this case, Valero.[8] Valero delivered 199.98 of metric tons

of fuel to the Vessel, and alleges that although the "authorized vessel officer" of the Vessel

acknowledged receipt of the fuel and stamped Valero's bunkering certificate,[9] Valero has never

received the $124,388.24 that it is owed for its services.[10]

After Valero supplied bunkers to the Vessel, the O.W. Bunker group of companies, including

O.W. Malta and O.W. USA, underwent a complete collapse of their worldwide business operation.[11]

---

[5] *Id.*

[6] *Id.* at pp. 2–3.

[7] Rec. Doc. 14-3 at p. 2.

[8] Rec. Doc. 14-1 at p. 2; Rec. Doc. 18-1 at p. 1.

[9] Rec. Doc. 14-1 at p. 3.

[10] Rec. Doc. 1 at p. 3.

[11] Rec. Doc. 14-1 at p. 5.

2

Valero contends that O.W. USA advised Valero that it would not make any of the required payments under their sales agreement, and that on November 13, 2014, O.W. USA and other related entities filed for Chapter 11 bankruptcy.[12] O.W. Malta, from which the bunkers had been ordered in the first place, also declared bankruptcy at about the same time.[13] The owners of the Vessel then commenced arbitration proceedings in London against O.W. Malta and its alleged assignee bank, ING Bank, seeking a declaration of non-liability toward O.W. Malta/ING Bank with respect to their alleged claim for payment.[14]

**B.    *Procedural Background***

On November 26, 2014, Valero filed the instant suit and requested that this Court arrest the Vessel, which the Court granted on the same day.[15] Valero and the Vessel's owner then entered into a security agreement whereby a letter of undertaking was posted as the substitute *res* for Valero's claim against the vessel.[16] On April 10, 2015, Verna, appearing solely and restrictively as *in rem* claimant and owner of the Vessel, filed an answer.[17] Valero filed a motion for summary judgment on June 5, 2015,[18] which the Court denied on December 28, 2015.[19] In that order, the Court concluded that, as a matter of law on the alleged undisputed facts presented, Valero did not have a

---

[12] *Id.*

[13] Rec. Doc. 18-1 at p. 2.

[14] *Id.*

[15] Rec. Doc. 4.

[16] Rec. Doc. 14-1 at p. 5.

[17] Rec. Doc. 10.

[18] Rec. Doc. 14.

[19] Rec. Doc. 31.

maritime lien against the Vessel.[20]

While Valero's motion was pending, Verna filed a cross motion for summary judgment on December 22, 2015.[21] On December 29, 2015, Valero requested that the Court continue the submission deadline and extend trial and other deadlines in order to accommodate its intention to take a corporate deposition of Verna.[22] The Court declined to continue the trial date, but granted a limited extension of the discovery deadline, and continued the submission date for the instant motion to February 3, 2016.[23]

On January 25, 2016, Valero filed a motion for reconsideration of the Court's prior order denying summary judgment to Valero.[24] The next day, on January 26, 2016, Valero filed its opposition to Verna's cross motion for summary judgment.[25] The Court held oral argument on the cross motion for summary judgment on February 3, 2016.[26]

## II. Parties' Arguments

### A.   *Verna's Arguments in Support of Summary Judgment*

In Verna's cross motion for summary judgment, the Vessel owner incorporates its arguments that were made in opposition to Valero's motion for summary judgment,[27] and which the Court

---

[20] *Id.*

[21] Rec. Doc. 29.

[22] Rec. Doc. 37.

[23] Rec. Doc. 38.

[24] Rec. Doc. 39.

[25] Rec. Doc. 41.

[26] Rec. Doc. 47.

[27] Rec. Doc. 29-1.

ultimately addressed in its order denying the motion.[28] The motion also seeks to inform the Court of several updates that occurred in the months following the initial briefing. Namely, the motion states that the O.W. Bunker bankruptcy has resulted in a tide of litigation brought by both the ultimate suppliers of bunkers, such as Valero, and in some cases by trustees of the O.W. Bunker bankruptcy estates and/or ING Bank.[29]

Verna contends that concurrent arbitration in England will likely require Verna to pay O.W. Malta for the bunkering fuel at issue, and therefore a ruling against it in this matter would expose Verna to double payment.[30] Verna refers to *The Res Cogitans*, a recent decision by the England Court of Appeal, in which Verna was not involved, where the court held that a vessel owner was required to pay O.W. Malta for the fuel that was physically delivered to the vessel by an independent fuel supplier because title to the fuel remained with O.W. Malta.[31]

Verna also alleges that the Southern District of New York has recently recognized that the equities of the bankruptcy crisis favor vessel owners, citing a decision by Judge Valerie E. Caproni, who expressed concern that vessel owners would be put in a position of paying twice for the same fuel bunkers.[32] Verna contends that Valero's proper remedy is to make a claim against O.W. USA in the company's bankruptcy proceedings, along with other creditors, rather than "jump the line"

---

[28] Rec. Doc. 31.

[29] *Id.* at pp. 2–3.

[30] *Id.* at p. 3.

[31] *Id.*

[32] *Id.* at p. 4 (citing *UPT Pool Ltd. v. Dynamic Oil Trading (Singapore) PTE. Ltd.*, No. 14-9262, 2015 WL 4005527, at *2 (S.D.N.Y. July 1, 2015)).

by asserting a maritime lien.[33]

Finally, Verna cites a decision by another section of the Eastern District of Louisiana, *Martin Energy Services, L.L.C. v. M/V Bourbon Petrel*, in which it contends that the court found that *Lake Charles Stevedores*, the Fifth Circuit decision relied upon by Verna, applies to disputes of this type.[34] Citing the Fifth Circuit, *Martin Energy Services* stated that "it is not whether an intermediary can be expected to supply the necessaries itself that distinguishes instances in which the actual suppliers have liens, but it is rather the nature of the relationship between each pair of entities that are involved in the transaction at issue."[35] Here, Verna argues, the undisputed facts show that Verna did not have a business relationship with Valero, that it contracted only with O.W. Malta, and that the O.W. Bunker entities ultimately subcontracted with Valero.[36] Verna contends that neither the Vessel's owner, charterer, nor any agent with authority to bind the Vessel selected Valero to provide fuel to the Vessel.[37]

**B.    *Valero's Arguments in Opposition***

In opposition, Valero alleges that Verna and its agent, Almi Tankers S.A. ("Almi Tankers"), knew that O.W. Malta could not itself supply and deliver the bunkers, and would have to assign a domestic supplier to do so.[38] Moreover, Valero argues, it was the only local bunker in Corpus

---

[33] *Id.* at p. 5. In oral argument, it was revealed that Valero had in fact taken these steps to secure payment.

[34] *Id.* (citing *Martin Energy Servs., LLC v. M/V Bourbon Petrel*, 2015 WL 2354217, at *8 (E.D. La. May 14, 2015) (Fallon, J.)).

[35] *Id.* (citing *Martin Energy Servs.*, 2015 WL 2354217, at *8).

[36] *Id.* at p. 6.

[37] *Id.*

[38] Rec. Doc. 41 at p. 1.

Christi, where the Vessel refueled.[39] Valero alleges that it agreed to supply fuel subject to the standard maritime lien recognized under U.S. law in favor of American suppliers.[40] Valero contends that O.W. Malta notified the Vessel owners that Valero would supply and deliver the bunkers, and that Almi Tankers agreed to the arrangement.[41] Valero argues that thereafter, the logistical supply and delivery of the bunkers was coordinated between Moran Gulf Shipping, the local agent of the Vessel, and Kirby Marine, Valero's agent and barge bunkering contractor.[42] According to Valero, the Commercial Instruments and Maritime Liens Act ("CIMLA") requires that on facts such as these, the Court must recognize Valero's lien against the Vessel.[43]

Valero argues that "denying an American physical supplier a maritime lien not only financially harms that supplier, but also creates a major disincentive to supply goods on credit to foreign ships calling at U.S. ports. That disincentive harms commerce by (1) limiting the number of necessary suppliers that will provide such goods on credit, which in turns drives up the cost of such goods, (2) leads to pre-payment requirements, which drives up transactional costs, (3) slows the pace of maritime commerce, and (4) ultimately reduces the number of American suppliers of necessaries."[44] Valero also argues that requiring a direct relationship between Valero and the ship owners ignores the business reality that middlemen such as O.W. Malta are commercially

---

[39] *Id.*

[40] *Id.*

[41] *Id.*

[42] *Id.* at p. 2.

[43] *Id.* at p. 4.

[44] *Id.* at p. 5.

7

disinclined to disclose their business contacts.[45]

Next, Valero argues that Verna has misstated the impact of the decision in *The Res Cogitans*.[46] According to Valero, *The Res Cogitans* rested on the question of whether the transaction between the vessel owner and O.W. Malta was governed by the English Sale of Goods Act of 1979 and the importance, or lack thereof, of whether O.W. Malta could transfer title to the bunkers.[47] Valero contends that the English Court of Appeal did not rule on the owner's liability for the bunkers or the respective rights of the different interests, and did not hold or imply that the vessel owner could be liable to pay twice for the bunkers.[48] Valero argues that factually and contractually, *The Res Cogitans* decision has no relevance to the instant case.[49]

Valero also argues that Verna has no standing to plead that the equities are in its favor.[50] Valero argues that in light of Almi Tankers' pre-delivery knowledge that O.W. Malta could not provide or deliver the bunkers, Almi Tankers' acceptance of Valero as supplier, and the ship's officer's acknowledgment that its vessel has "ultimate responsibility and liability for the debt," Almi Tankers and, through it, Verna, were on notice of Valero's right to a lien. Valero also argues that it is the only party asserting a lien, and that neither O.W. Malta nor O.W. USA has arrested the Vessel or intervened in this suit asserting a lien.[51]

---

[45] *Id.*

[46] *Id.*

[47] *Id.* at p. 6.

[48] *Id.*

[49] *Id.*

[50] *Id.* at p. 7.

[51] *Id.*

Valero also argues that *Lake Charles Stevedores*, relied on heavily by Verna, is distinguishable because, in *Lake Charles Stevedores*, the stevedoring services in question were just one of several services that Broussard Rice Mill, the seller and domestic supplier, undertook under its contract with the vessel.[52] There, Valero contends, the Fifth Circuit declined to find a maritime lien where a sub-contractor had supplied a discrete, small part of Broussard's obligation to the vessel, and thus treated the stevedore as a sub-contractor, not the principal supplier under the contract.[53] Valero avers that here, by contrast, the case involves just a single bunker supplier selling a single marine necessary product, just as in *Marine Fuel Supply and Towing, Inc. v. M/V Ken Lucky*, where the Ninth Circuit recognized that the sole direct physical provider and supplier was entitled to a maritime lien despite the existence of intervening middlemen.[54]

Furthermore, Valero argues, unlike in *Lake Charles Stevedores*, here, the authorized officer of the M/V Almi Sun signed the bunkering certificate, acknowledging the Vessel's "ultimate responsibility."[55] Valero contends that signing and stamping the certificate acknowledged and ratified Valero's lien on the Vessel.[56] Furthermore, Valero argues, had the Vessel Officer contested any of the terms of the bunkering certificate, including the "no lien" clause, his authority would be binding on and effective against Valero.[57] Valero avers that prior authorization was not required, and that authorization given prior to or during rendition of services, or ratification subsequent to the

---

[52] *Id.* at p. 8.

[53] *Id.*

[54] *Id.*

[55] *Id.*

[56] *Id.* at p. 9 (citing *Atl. & Gulf Stevedores, Inc. v. M/V Grand Loyalty*, 608 F.2d 197, 202 (5th Cir. 1979)).

[57] *Id.* (citing *Ferromet Res., Inc. v. Chemoil Corp.*, 5 F.3d 902 (5th Cir. 1993)).

rendition of services, suffices to establish a lien.[58]

Valero argues that *Ken Lucky* is the only circuit court opinion on point, and in that decision, the Ninth Circuit provided maritime authority for the proposition that the existence of an intermediary does not defeat the supplier's maritime lien when furnishing bunkers on an order of a person authorized by statute to bind the ship.[59] Valero contends that *Ken Lucky* involves the exact same scenario as the instant case, but that this case has fewer intermediaries between Valero and the ship, a distinction that is immaterial under CIMLA.[60] As in *Ken Lucky*, Valero avers, it was not a subcontractor of a separate activity unrelated to Almi Tankers' order for necessaries, and therefore the rule in *Ken Lucky* applies because Almi Tankers ordered O.W. Malta to obtain bunkers in Corpus Christi and then approved Valero as the actual bunker supplier with its ship's officer acknowledging the debt of the vessel.[61]

## III. Law and Analysis

### A.   *Standard on a Motion for Summary Judgment*

Summary judgment is appropriate when the pleadings, the discovery, and any affidavits show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[62] When assessing whether a dispute as to any material fact exists, the court

---

[58] *Id.* (citing *Atl. & Gulf Stevedores*, 608 F.2d at 202; *Jan C. Uiterwyk Co. v. M/V Mare Arabico*, 459 F. Supp. 1325, 1331 (D. Md. 1978); *Galehead, Inc. v. M/V GOODPAL*, No. 98-148, 1999 WL 1488986, at *2 (W.D. Wash. Jan. 20, 1999)).

[59] *Id.* at p. 12 (citing *Marine Fuel Supply & Towing, Inc. v. M/V Ken Lucky*, 869 F.2d 473 (9th Cir. 1988)).

[60] *Id.* at p. 13.

[61] *Id.* (citing *Belcher Co. of Ala., Inc. v. M/V Maratha Mariner*, 724 F.2d 1161, 1163–64 (5th Cir. 1984); *Tramp Oil and Marine, Ltd. v. M/V Mermaid I*, 805 F.2d 42, 44 (1st Cir. 1986)).

[62] Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).

considers "all of the evidence in the record but refrains from making credibility determinations or weighing the evidence."[63] All reasonable inferences are drawn in favor of the nonmoving party, but "unsupported allegations or affidavits setting forth 'ultimate or conclusory facts and conclusions of law' are insufficient to either support or defeat a motion for summary judgment."[64] If the record, as a whole, could not lead a rational trier of fact to find for the non-moving party, then no genuine issue of fact exists and the moving party is entitled to judgment as a matter of law."[65] The nonmoving party may not rest upon the pleadings, but must identify specific facts in the record and articulate the precise manner in which that evidence establishes a genuine issue for trial.[66]

The party seeking summary judgment always bears the initial responsibility of informing the Court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact.[67] To withstand a motion for summary judgment, a non-moving party must show that there is a genuine issue for trial by presenting evidence of specific facts.[68] Thus, the non-moving party should "identify specific evidence in the record, and articulate" precisely how that evidence supports his claims.[69] The nonmovant's burden of demonstrating a genuine issue of material fact is not satisfied merely by creating "some metaphysical doubt as to the material facts," "by conclusory allegations," by "unsubstantiated assertions," or "by only a scintilla of evidence."[70] Rather, a factual dispute precludes a grant of

---

[63] *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398–99 (5th Cir. 2008).

[64] *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985); *Little*, 37 F.3d at 1075.

[65] *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986).

[66] *See, e.g.*, *Celotex*, 477 U.S. at 325; *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998).

[67] *Celotex*, 477 U.S. at 323.

[68] *Bellard v. Gautreaux*, 675 F.3d 454, 460 (5th Cir. 2012) (citing *Anderson*, 477 U.S. 242 at 248–49).

[69] *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994), *cert. denied* 513 U.S. 871 (1994).

[70] *Little*, 37 F.3d at 1075.

summary judgment only if the evidence is sufficient to permit a reasonable trier of fact to find for the nonmoving party. Hearsay evidence and unsworn documents that cannot be presented in a form that would be admissible in evidence at trial do not qualify as competent opposing evidence.[71]

## B.    *Legal Standard for a Maritime Lien*

"The purpose of maritime liens is 'to enable a vessel to obtain supplies or repairs necessary to her continued operation by giving a temporary underlying pledge of the vessel which will hold until payment can be made or more formal security given.'"[72] Maritime liens may arise only by operation of law, rather than by agreement of the parties.[73] In the United States, maritime liens are largely governed by the Commercial Instruments and Maritime Liens Act ("CIMLA"), which in relevant part provides that:

(a) Except as provided in subsection (b) of this section, a person providing necessaries to a vessel on the order of the owner or a person authorized by the owner—

(1) has a maritime lien on the vessel;

(2) may bring a civil action in rem to enforce the lien; and

(3) is not required to allege or prove in the action that credit was given to the vessel.

---

[71] *Martin v. John W. Stone Oil Distrib., Inc.*, 819 F.2d 547, 549 (5th Cir. 1987); Fed. R .Civ. P. 56(c)(2).

[72] *Lake Charles Stevedores, Inc. v. PROFESSOR VLADIMIR POPOV MV*, 199 F.3d 220, 223 (5th Cir. 1999) (quoting *S. Coal & Coke Co. v. F. Grauds Kugniecibas ("The Everosa")*, 93 F.2d 732, 735 (1st Cir. 1937)).

[73] *Vestoil, Ltd. v. M/V M Pioneer*, 148 F. App'x 898, 900 (11th Cir. 2005); *see also Bird of Paradise*, 72 U.S. 545, 555 (1866); *Newell v. Norton*, 70 U.S. 257, 262 (1865) ("Maritime liens are not established by the agreement of the parties. . . . They are consequences attached by law to certain contracts, and are independent of any agreement between the parties that such liens shall exist. They, too, are *stricti juris*."); *Marine Oil Trading Ltd. v. M/T PAROS*, 287 F. Supp. 2d 638, 644 (E.D. Va. 2003) ("While a maritime lien does arise by operation of law rather than by agreement between the parties, there are a number of reasons for including contractual language alerting the parties to the existence of a lien on the ship. This language does not, however, actually give rise to the lien.").

(b) This section does not apply to a public vessel.[74]

CIMLA defines "necessaries" as including "repairs, supplies, towage, and the use of a dry dock or marine railway,"[75] and also provides that:

(a) The following persons are presumed to have authority to procure necessaries for a vessel:

(1) the owner;

(2) the master;

(3) a person entrusted with the management of the vessel at the port of supply; or

(4) an officer or agent appointed by—

(A) the owner;

(B) a charterer;

(C) an owner pro hac vice;

(D) an agreed buyer in possession of the vessel.[76]

Although the supplier of necessaries may in certain circumstances be entitled to a maritime lien, such liens are not automatic, but depend on the relationships between the various parties involved.[77]

---

[74] 46 U.S.C. § 31342.

[75] 46 U.S.C. § 31301(4).

[76] 46 U.S.C. § 31341(a).

[77] *Martin Energy Servs., LLC v. M/V BOURBON PETREL*, Nos. 14-2986, 15-79, 15-81, 2015 WL 2354217, at *7 (E.D. La. May 14, 2015) (Fallon, J.) (citing *Lake Charles Stevedores, Inc. v. PROFESSOR VLADIMIR POPOV MV*, 199 F.3d 220, 229 (5th Cir. 1999)).

13

## C.     *Analysis*

In the Court's prior order denying summary judgment to Valero, the Court concluded as a matter of law that on the alleged undisputed facts presented, Valero did not have a maritime lien.[78] Verna's cross-motion for summary judgment incorporates the arguments it made in opposition to Valero's motion for summary judgment, which the Court has already deemed persuasive in its prior order, and alerts the Court to several recent developments that it claims further support its position.[79] In both its motion for reconsideration and its opposition to the cross-motion for summary judgment, Valero repeats and builds on many of the legal arguments it made in its own motion for summary judgment, and raises several facts that it claims were revealed through the corporate deposition of Verna that buttress its arguments that Valero is entitled to a maritime lien against the Vessel.[80]

The parties do not dispute that the first two elements for establishing a maritime lien have been met. It is undisputed that: (1) Valero is a person providing necessaries; and (2) the necessaries were provided to a vessel. The question for the Court, therefore, is whether Valero did so "on the order of the owner or a person authorized by the owner." The key facts that Valero relies upon now, which generally were not argued in its motion for summary judgment, are that: (1) Almi Tankers, agent for the Vessel, knew that O.W. Malta itself could not provide the bunkers and authorized O.W. Malta to designate a bunker supplier for the Vessel;[81] (2) before delivery, Almi Tankers knew of the designation of Valero as the domestic supplier and accepted Valero as such;[82] (3) at the time that

---

[78] Rec. Doc. 31.

[79] Rec. Doc. 29-1.

[80] Rec. Doc. 41.

[81] Rec. Doc. 41-6 at p. 1.

[82] *Id.* at p. 2.

bunkering occurred, Valero was the only commercial bunkering supplier located in Corpus Christi, Texas, where the Vessel was bunkered;[83] (4) coordination of the physical delivery of Valero bunkers was conducted by Moran Gulf Shipping Agency, as local agent of the Vessel, and Kirby Corporation, as Valero delivery agent and contractor;[84] (5) in connection with the bunkering of the Vessel, three representative samples of the bunker fuel supplied to the Vessel were taken in the presence of representatives of both Valero and the Vessel;[85] (6) there was no involvement, participation, supervision or coordination in the delivery of the bunkers or the collection of bunker samples by O.W. USA or O.W. Malta;[86] and (7) Almi Tankers has acknowledged its right to pay Valero for the bunkers and deduct that amount from any claim for payment by O.W. Malta.[87]

In determining whether a maritime lien exists, courts weigh a number of factors, including whether an entity with authority to bind the vessel selects or "nominates" the ultimate supplier of necessaries,[88] whether the company hired by a vessel or vessel agent could be liable for breach of contract for failure to supply a necessary,[89] whether a vessel's contract with the general contractor also lists a subcontractor,[90] whether a general contractor refuses to take responsibility for a subcontractor's work,[91] whether the vessel's operators deal directly with a subcontractor in

---

[83]  *Id.*

[84]  *Id.*

[85]  *Id.* at pp. 2–3.

[86]  *Id.* at p. 3.

[87]  *Id.*

[88]  *Lake Charles Stevedores, Inc. v. PROFESSOR VLADIMIR POPOV MV,* 199 F.3d 220, 231–32 (5th Cir. 1999)).

[89]  *Id.*

[90]  *Id.* at 231.

[91]  *Id.*

discussing, testing and inspecting the subcontractor's work,[92] and whether subcontractors were identified and accepted by the vessel's owner or charterer prior to performance.[93] On the facts presented in Valero's original motion for summary judgment, the Court weighed these and other factors and ultimately concluded that Valero had not established that it had a maritime lien.[94]

The facts now highlighted by Valero do not upend the Court's prior analysis. Valero argues, for example, that Almi Tankers knew that O.W. Malta could not itself provide the bunkers and authorized O.W. Malta to designate a bunker supplier for the Vessel.[95] Similarly, Valero argues that before delivery, Almi Tankers knew of the designation of Valero as the domestic supplier and accepted Valero as such.[96] However, as the Fifth Circuit explained in *Lake Charles Stevedores, Inc. v. PROFESSOR VLADIMIR POPOV MV*, merely knowing that a subcontractor would be used, or even that a particular supplier would most likely be used, to ultimately furnish necessaries, does not necessarily create a maritime lien.[97] Although some courts have found that the expectation that subcontractors will be hired could weigh in favor of finding that those subcontractors have a maritime lien,[98] the Fifth Circuit in *Lake Charles Stevedores* noted that this factor is not dispositive, holding that "it is not whether an intermediary can be expected to supply the necessaries itself that distinguishes instances in which the actual suppliers have liens, but it is rather the nature of the

---

[92] *Stevens Tech. Servs., Inc. v. United States*, 913 F.2d 1521, 1535 (11th Cir. 1990)

[93] *Id.* at 1534; *Turecamo of Savannah, Inc. v. United States*, 824 F. Supp. 1069, 1072 (S.D. Ga. 1993)).

[94] Rec. Doc. 31.

[95] Rec. Doc. 41-6 at p. 1.

[96] *Id.* at p. 2.

[97] *Lake Charles Stevedores*, 199 F.3d at 231–32; *see also Crescent City Marine Inc. v. M/V Nunki*, 20 F.3d 665, 668 (5th Cir. 1994); *S.C. State Ports Auth. v. M/V Tyson Lykes*, 67 F.3d 59, 60 (4th Cir. 1995).

[98] *See Stevens Tech. Servs., Inc.*, 913 F.2d at 1534; *Galehead, Inc. v. M/V Anglia*, 183 F.3d 1242, 1246 (11th Cir. 1999).

relationship between each pair of entities that are involved in the transaction at issue (e.g., agent vs. independent contractor.)"[99]

Other facts alleged by Valero do weigh more strongly in finding the existence of a maritime lien. For example, Valero avers that O.W. Malta was uninvolved in the coordination of the actual delivery of bunkers and that the Vessel representatives inspected Valero's work.[100] In *Marine Coatings, Inc. of Alabama v. United States*, the Eleventh Circuit found a triable issue of fact regarding whether a broker/general contractor was entitled to a lien where the owner of the vessel was aware of the subcontractor's performance before and during the performance and the owner inspected the subcontractor's work.[101] Similarly, in *Stevens Technical Services, Inc. v. United States*, the Eleventh Circuit held that a subcontractor had a maritime lien where the vessel's contract with the general contractor also listed the subcontractor, the general contractor refused to take responsibility for the subcontractor's work, the vessel's operators dealt directly with a subcontractor in discussing, testing, and inspecting the subcontractor's work, the subcontractors were identified and accepted by the vessel's owner or charterer prior to performance, and the vessel operator knew that the general contractor was not capable, either by facilities or experience, to complete the full scope of the work ordered.[102]

The case relied upon most heavily by Valero, however, is the Ninth Circuit's decision in *Marine Fuel Supply & Towing, Inc. v. M/V Ken Lucky*.[103] This Court, in its Order denying summary

---

[99] *Lake Charles Stevedores*, 199 F.3d at 231.

[100] Rec. Doc. 41-6 at pp. 2–3.

[101] 932 F.2d 1370 (11th Cir. 1991).

[102] *Stevens Tech. Servs., Inc.*, 913 F.2d at 1534.

[103] 869 F.2d 473 (9th Cir. 1988).

judgment to Valero, already engaged in a detailed analysis of the holdings of both *Lake Charles Stevedores* and *Ken Lucky*, the two cases repeatedly cited by Valero and Verna, and found that *Ken Lucky* did not dictate a finding in this case that Valero was entitled to a maritime lien.[104] At oral argument, however, counsel for Valero argued that the facts in the instant case are more similar to *Ken Lucky*, and therefore are distinguishable from *Lake Charles Stevedores*, because *Lake Charles Stevedores* involved a general contractor hired to perform multiple services, only one of which—the provision of stevedoring services—could be considered a necessary that would entitle a subcontractor to a maritime lien. Counsel for Valero argued that this case, on the other hand, involves a contract whose sole purpose is to provide a necessary to a vessel, and that service was performed entirely and exclusively by Valero, thus entitling Valero to a maritime lien.

The Court notes, however, that while this factual distinction may be true, Valero ignores the Fifth Circuit's own explanation of the distinctions between *Ken Lucky* and *Lake Charles Stevedores*. In *Lake Charles Stevedores*, the subcontractor similarly argued that *Ken Lucky* should apply.[105] The Fifth Circuit held, however, that a review of *Ken Lucky* and similar cases did not reveal, as the stevedoring service had suggested, "that the actual deliverer of necessaries to the vessel is the entity entitled to a lien in every instance."[106] Instead, the Fifth Circuit held, although *Ken Lucky*, like both *Lake Charles Stevedores* and the instant case, involved the acceptance of necessaries by a person authorized to bind the vessel, the chief distinguishing fact in *Ken Lucky* was that the order originated from the subcharterer, who had authority to bind the vessel, and that therefore the ultimate supplier

---

[104] Rec. Doc. 31 at pp. 22–28.

[105] *See Lake Charles Stevedores*, 199 F.3d at 230.

[106] *Id.* at 229.

of necessaries was entitled to a lien.[107] In fact, in describing the Ninth (and Second) Circuit's jurisprudence, the Fifth Circuit noted that those circuits "require that an entity with authority to bind the vessel *direct* that the general contractor hire a particular subcontractor in order for that subcontractor to be entitled to a lien."[108] At oral argument, Valero conceded that Verna did not select Valero, but rather argued that Verna nevertheless approved the selection of the bunker supplier. This Court has already concluded, however, that Fifth Circuit precedent holds that acceptance of services from a supplier of necessaries does not alone create a maritime lien.[109]

In its opposition to the cross motion for summary judgment, Valero also argues that Verna's actions ratified the selection of Valero. At oral argument, Valero relied heavily on an e-mail sent by Almi Tankers to the captain of the Vessel alerting the captain that the Vessel would be receiving bunkers in Corpus Christi, Texas.[110] This Court already rejected Valero's ratification argument, addressed only briefly in Valero's initial motion for summary judgment, in its prior order.[111] Considering the e-mail and other facts cited by Valero, however, does not change the Court's analysis. The e-mail directs the Vessel's captain to "coordinate with the agents for prompt delivery avoiding any delays," and directs the Vessel's agents to "coordinate with the suppliers and the master and do your outmost [sic] the bunkers to be delivered without delays."[112] The e-mail further instructs that the bunkering certificate should contain the name and IMO of the receiving ship, the

---

[107] *Id.* at 230.

[108] *Id.* at 231.

[109] Rec. Doc. 31 at p. 27.

[110] Rec. Doc. 41-3.

[111] Rec. Doc. 31 at pp. 28–29.

[112] *Id.* at p. 2.

date and commencement of bunkering, the quantity supplied, and other details.[113] However, the Fifth Circuit in *Lake Charles Stevedores* rejected similar arguments in determining that the actions on the part of the master of the vessel did not ratify the provision of stevedoring services and thereby bind the vessel to a maritime lien.[114] There, the Fifth Circuit held that no maritime lien had been created despite the fact that the vessel was aware that the subcontractor was supplying necessaries, was provided instructions prior to the loading of the vessel, the vessel's hatches were opened and closed for the subcontractor's purposes by the crew, the mate or the master of the ship signed the subcontractor's activity sheets, the subcontractor was allowed on board without objection, the subcontractor used the vessel's gear, and the vessel's crew, not the general contractor, supervised the loading operation.[115] Here, in light of the Fifth Circuit's rejection of the same argument on similar facts**,** the fact that the Vessel's captain was forewarned by Almi Tankers that the Vessel would be receiving bunkers from Valero and given instructions to coordinate with Valero neither establishes the distinguishing factor in *Ken Lucky*—the selection of the supplier by a party authorized to bind the vessel—nor amounts to ratification of a maritime lien against the Vessel. In short, the facts cited by Valero cannot establish that the provision of necessaries to a vessel were made "on the order of the owner or a person authorized by the owner."[116]

Finally, Valero argued at oral that the purpose of CIMLA is to protect American suppliers like Valero. However, although Valero appeared to take it for granted that it was the actual supplier of necessaries and therefore the only party who could be entitled to a maritime lien, Verna contends

---

[113] *Id.*

[114] *Lake Charles Stevedores, Inc.*, 199 F.3d at 231–32.

[115] *Id.*

[116] 46 U.S.C. § 31342.

that O.W. Malta, as the company that contracted to supply the bunkers, is the party entitled to a maritime lien. In *Galehead, Inc. v. M/V Anglia*, the Eleventh Circuit recognized that a party need not be the physical supplier or deliverer to have "provided" necessaries under the statute.[117] Therefore, the court held, the contracting party, or the broker, could be considered the party that supplied necessaries.[118] Although Valero correctly notes that CIMLA was designed to protect American suppliers,[119] the Court declines to find as a matter of law that Valero is entitled to a maritime lien simply because it, and not O.W. Malta, is an American company. Despite CIMLA's purpose to protect American suppliers, however, the Court cannot favor American companies so heavily as to ignore CIMLA's third statutory requirement for asserting a maritime lien: namely, that the provision of necessaries to a vessel be "on the order of the owner or a person authorized by the owner." The Court is persuaded by the Eleventh Circuit's recognition, in *Dresdner Bank AG, Dresdner Bank AG in Hamburg v. M/V OLYMPIA VOYAGER*, that "uniform application of CIMLA is important to assure that both suppliers and vessels will justifiably expect that a supplier that furnishes necessaries to a vessel in a United States port will be protected."[120]

Therefore, for the reasons stated above and in the Court's order denying summary judgment to Valero, the Court concludes that Valero is not entitled to a maritime lien against the Vessel. The Court notes that in addition to opposing the instant cross-motion for summary judgment, Valero filed

---

[117] 183 F.3d 1242, 1245 (11th Cir. 1999) (citing *The Golden Gate Knutsen v. Associated Oil Co.*, 52 F.2d 397, 400 (9th Cir. 1931); *A/S Dan-Bunkering Ltd. v. M/V Zamet*, 945 F. Supp. 1576, 1578–79 (S.D. Ga. 1996)).

[118] *Id.* ("Therefore, Polygon 'provided' necessaries to the vessel under the contract irrespective of how, or by whom, the delivery was carried out.").

[119] *See Tramp Oil & Marine, Ltd. v. M/V Mermaid I*, 805 F.2d 42, 46 (1st Cir. 1986) ("The primary concern of the Federal Maritime Lien Act is the protection of American suppliers of goods and services."); *Gulf Trading & Transp. Co. v. The Vessel Hoegh Shield*, 658 F.2d 363, 367 (5th Cir. 1981), *cert. denied*, 457 U.S. 1119 (1982) ("The congressional intent is that an American supplier of goods, services or necessaries to a foreign vessel obtains a maritime lien in the vessel when the goods or services are supplied or performed in the United States.").

[120] 463 F.3d 1210, 1216 (11th Cir. 2006).

a motion for reconsideration of the Court's prior order.[121] Although Valero did not clearly state the basis of its motion, it appears that the company was requesting the Court to amend its Order on the basis of a manifest error of law or to present newly discovered evidence.[122] As the Court has addressed both the legal arguments and the undisputed facts averred by Valero in the instant motion, the Court declines, for the reasons already stated, to reconsider its prior ruling.

### IV. Conclusion

Accordingly,

**IT IS HEREBY ORDERED** that Verna's "Cross Motion for Summary Judgment"[123] is **GRANTED**.

**IT IS FURTHER ORDERED** that Valero's "Motion to Reconsider and to Alter or Amend Order"[124] is **DENIED**.

**NEW ORLEANS, LOUISIANA,** this  8th  day of February, 2016.

**NANNETTE JOLIVETTE BROWN
UNITED STATES DISTRICT JUDGE**

---

[121] Rec. Doc. 39.

[122] Rec. Doc. 39-1 at p. 2.

[123] Rec. Doc. 29.

[124] Rec. Doc. 39.

22